OF

## CASES ARGUED AND DETERMINED

AT

## JUNE TERM, 1838.

7p 293
120 633
120 634

IN THE MATTER OF J. L. DORSEY.

1. The object to be attained by the people, when assembled in convention, was not the formation of a mere government—It was to form a government with *clearly defined and limited powers*, in order that the general, great and essential principles of liberty and free government might be recognized.

2. The declaration of rights is an enumeration of certain rights which are expressly retained and excepted out of the powers granted, and the particular enumeration of rights contained in the declaration, cannot be construed to disparage or deny others retained by the people.

3. The declaration of rights is the governing and controlling part of the constitution, and all its general powers are to be expounded, and their operation extended or restrained, with reference to it.

4. By the declaration, each citizen is entitled to all the rights or privileges, which any other citizen can enjoy or possess; every citizen has the right to aspire to office, or to pursue any lawful avocation; and this general equality is one of the fundamental rights of each citizen, and the power to destroy this equality must be expressly given, or arise by clear implication, or it can have no legal existence.

In the matter of J. L. Dorsey.

5. The General Assembly is not expressly prohibited from enacting laws requiring political test-oaths to be taken, nor from excluding some of its citizens from the pursuit of certain trades or avocations—yet such laws would be inoperative, because they are adverse to the principles of liberty and free government.

6. Yet, the Legislature does not look to the constitution for a grant of powers, but may exercise all such as are compatible with the social compact, unless restrained by express inhibition or clear implication.

7. Wherever no qualification is prescribed as a condition for office or station, the door is open to every citizen, and wherever power is given to exclude, it specifies with much precision, the cases in which it may be exercised; but the Legislature are not prevented from prescribing qualifications to be possessed, before any avocation, or business, can be pursued, so long as the qualification can be attained by all.

8. If an affirmative grant of power to disqualify a citizen from holding office, or pursuing any avocation, is not found in the constitution, it cannot be said to exist :—Such a grant of power must be exercised strictly in the manner prescribed.

9. The General Assembly is invested with plenary power over the subject matter of duelling, extending to disqua ification from office, or from the exercise of any avocation, profession, franchise or function, of a public nature, and any oath may be required as a qua ification for office, imposing on the conscience, any ob igation to do, or commit any act, which can be performed, or omitted, by any citizen, *in relation to any matter connected with the suppression of the practice of duelling.*

10. But the retrospective part of the duelling oath, imposed by the act passed January seventh, eighteen hundred and twenty-six, called the duelling act, which requires a state of innocence not possessed by all, imposes a disqualification upon the guilty. Disqualification from office, or from the pursuit of a lawful avocation, is therefore a punishment.

11. The duelling act prescribes a mode of ascertaining and punishing gui't, unwarranted by the constitution, and in contravention of the declaration of rights.

In the matter of J. L. Dorsey.

12. The duelling act, a'so, imposes a penalty, which cannot be remitted, and inflicts a punishment beyond the reach of Executive clemency.

13. Therefore,—as the several parts of the oath, required to be taken by counsellors and attorneys, cannot be disjoined; and as the oath is in part illegal, it cannot be imposed.

[*Per* GOLDTHWAITE, J.

1. The word office, in the Constitution, is used in its legal and technical sense, and implies a charge or trust, conferred by public authority, and for a public purpose. An attorney or counsellor, is not an officer, in the meaning of the Constitution.

2. No authority, to require the oath against duelling, to be taken by attorneys and counsellors at law, prescribed by the act of eighteen hundred and twenty-six, can be derived from the grant of power contained in the third section of the sixth article of the constitution; nor did the legis.ature derive its authority to pass the act from that source.

3. But the power to pass *general* penal laws, to prevent the evil practice of duelling, must have been inc uded in the high powers conferred on the legis'ature, by its creation with legis'ative powers: a special grant of power was therefore nugatory.

4. All that was intended by the section of the constitution, was to authorise the legislature to make the offence of duelling, a disqualification from office. If, however, more was intended, and a further grant of power was made, to pass penal laws to suppress duelling, it was not an unlimited grant of power, but must be held subject to the same restrictions that the general grant of legislative power is.

5. The people, by the constitution, have enumerated and asserted certain first principles, which they therein dec'are they have reserved to themselves, and have not delegated to the legislative department of the government.

6. Any act of the legislature which violates any of the asserted rights, or which trenches on any of the great principles of civil liberty, or inherent rights of man, though not enumerated, **is void.**

In the matter of J. L. Dorsey.

7. The constitution is not to be construed as if it were a penal law, sing.ing out indi\idua's, and operating harsh y on them; it is for the benefit of the whole community, and shou d receive a 'argc and liberal' interp r tation : It is the most solemn act of the people, in th ir sovereign capacity, dictating the terms on which they are wil.ing to be governed, and must be preserved unimpaired.

8. The act of eighteen hundred and twenty-six, is a highly penal law, and must receive a strict construction, and the authority to pass it, be clearly and fairly derivable from the constitution :

9. It requires an app'icant, to practice law, to give evidence against himself, and offends against the tenth section of the bill of rights, and the first principles of natural justice.

10. The reservation by the people, of certain great rights and privileges, shou'd have a broad and liberal construction, to effect the intention of those who made the reservation ; and there is no power de'egated to invade these great natural rights, which exempt a man from being compe'led to give evidence against himse f, or from being deprived of his .ife, liberty or happiness, but by due course of law.

11. The right to practice law is a va'uab'e right, as deserving of protection as property,—and the duelling a t is contrary to the spirit, p'ain intent and meaning of the tenth section of the Bill of Rights.

12. The duelling act, so far as it prescribes an expurgatory oath, as a condition to the practice of law, is contrary to the scope and design of a free government, and imposes a test oath upon the applicant.

13. It also requires him to swear, that he has not, since the year eighteen hundred and twenty-six, or since he has been a resident of the State, done certain acts, and that he will abstain from so acting in future, which acts constitute no crime or offence known to our law.

14. The essence of a test oath is a prohibition to entertain certain religious or politica' opinions, which do not expose to punishment, but merely exclude from office, and their enormity con-

In the matter of J. L. Dorsey.

sists in this, that there is nothing in the opinions themselves required to be abjured, which unfits the person holding them, from filling the offices or dignities of State, but merely that such is the exaction of law ; and there is no more propriety in exacting the duelling oath from an attorney, than from a physician or planter.

15. The oath prescribed by the constitution, to be taken by public officers, by necessary implication, excludes the imposition of any other oath, as a qualification to office under the State government.

16. The third and fourth sections of the sixth article of the constitution, gives power to the Legislature, to exclude from office, persons guilty of certain offences,—but the commission of these offences cannot be ascertained by the oath of the accused.

17. So much of the sixteenth section of the act on the subject of duelling, as requires the oath therein prescribed, to be taken by attorneys and counsellors at law, is contrary to the constitution, and therefore void.

[*Per* ORMOND, J.

—

1. Formerly, every one required by the King's Writ to appear, was, by the common law, obliged to appear in person ; but after his appearance, it was competent for the *Chancery, King's Bench, Common Pleas*, or other court which held *plea by writ*, to admit him by attorney :

2. So the King, by grant under the great or privy seal, might authorise a plaintiff or defendant, in any suit, to make an attorney :

3. And rules have been adopted, from time to time, by the higher courts in England, on this subject, on the ground, that attorneys are officers of the courts in which they practice, and subject to their control and direction.

4. In the several States of the Union, the practice of the law is impliedly a *privilege*, to which the Legislature may attach such conditions, as its wisdom may dictate :

7 P.                    38

5. In this State, the practice of the law is regulated by the acts of eighteen hundred and seven, eighteen hundred and nineteen, and eighteen hundred and twenty-six:

6. Therefore, the right to exercise the functions which pertain to the profession of the law, is not an absolute right, derived from the law of nature, but takes its origin in the institutions of the social state,—and by these it is regulated.

7. A license to practice law confers a mere franchise or privilege, and is granted by the legislature, through their organ, the judges, and the license is conditional, depending for its efficacy, upon taking the oaths prescribed by law.

8. An attorney, as such, holds no office under the government, but holds a *privilege* or *profession*, acquired under the sanction of legislative authority.

9. If an attorney commit a breach of the conditions on which he is admitted to the bar, he forfeits his trust, in the same manner as the grantee of a public franchise does, who omits to perform the terms on which it was granted:

10. An attorney may be *disbarred* in a summary way, for dishonesty in his practice, or other sufficient cause,—which right rests upon the ground, that an attorney is an officer of the court before which he practices:

11. Therefore, the legislature may prescribe the qualifications of an attorney and counsellor, and the causes for which they may be excluded from their profession.

12. The legislative power of this State is not derived from a constitutional grant,—it was possessed previous to the formation of the constitution, and is regulated and controlled by that instrument. *Secus*, with the powers of the federal government:

13. The nineteenth section of the sixth article of the constitution, is a provision, addressed to the legislature merely, and does not impair the force of particular laws, for the prevention or punishment of crime:

14. The oath prescribed, by the act of eighteen hundred and

In the matter of J. L. Dorsey.

twenty-six, does not require the party taking it to make a disclosure of facts,—but merely to disavow his guilt of having given, accepted or carried a challenge to fight, &c. which is not a crime known to the laws.

15. The twenty-ninth article of *Magna Charta*, has never been considered as inhibiting the right of courts to punish for contempts, or to disbar an attorney without the intervention of a jury, and that provision is similar in its terms to that contained in our bill of rights on the same subject.

16. The thirtieth section of the bill of rights restrains, but does not extend power, and proves the competency of the legislature to adopt regulations not repugnant to the constitution.

17. Privileges or franchises, not particularly provided for by the constitution, are subject to such general regulations as the legislature may prescribe. The general powers of government concede this virtue to legislation.

18. The disfranchisement of a citizen is not an unusual punishment, and our constitution does not contemplate it as cruel.

19. The constitution does not forbid the legislature to enact laws, denying privileges or franchises, which are subject to *its own* regulation, to those who have done acts subversive of the public peace, or calculated to lower the standard of public morals, and consequently, on this subject, legislative discretion remains uncontrolled by any implied restraint.

20. The constitution, by prescribing an oath to be taken by public officers, does not inhibit the requirement of any other oath, from persons who may exercise a legislative franchise.

21. To authorise the judiciary to declare an act of the legislature void, the act must appear to be violative of the constitution, or some of its provisions.

22. The act of eighteen hundred and twenty-six is defensible upon principles of the purest morality, and the soundest policy, and is within the range of legislative competency.

23. The terms on which attorneys shall be admitted, and the causes for which they shall be disbarred, are matters of legis-

In the matter of J. L. Dorsey.

lative regulation, and consequently the act, so far as it relates to attorneys and counsellors, is not repugnant to the constitution.

[*Per* COLLIER, C. J.

In this case, a motion was made to admit John L. Dorsey, as an attorney and counsellor of the court, and to dispense with administering to him the oath, in relation to duelling, required by the act of eighteen hundred and twenty-six.

As this is a case *sui generis*, and of great importance, involving the constitutional power of the legislature, to pass the act of eighteen hundred and twenty-six, and in which the judges of the Supreme court delivered their opinions *seriatim;*—The reporter has thought he would better satisfy public opinion, and meet the expectations of the bar, by giving separately, the principal points of argument contained in the several opinions delivered by the members of the court. It would have given the Reporter great pleasure to have inserted at length, the able arguments of the learned applicant and his able coadjutor, but the nature of his obligations imperatively compelled him to abridge them to the dimensions in which they appear.

Mr. *Dorsey* said, that—

Questions of this character are always of great moment and delicacy.—They involve such interests and magnitude, and are of such deep and public concern, that the court, no doubt will approach them, with uncommon anxiety. The sovereignty of a State, in the exercise of its legislative powers, is not to be impaired, un-

less it be clear that it has transcended its legitimate authority, nor ought any power to be sought, much less to be adjudged in favor of the legislative department, unless it be clearly within the range of its constitutional charter. As the Supreme court of the State of Alabama, you are not at liberty to add one jot of power to the legislative department, beyond that which the people of the State have granted them; and, on the other hand, to support that constitution as it stands, and to give a fair and rational scope to all the powers which it clearly contains.

It is the peculiar office and province of the judiciary department, to determine whether an act of the legislature, which assumes the appearance of a law, and is clothed with the garb of authority, is made pursuant to the power vested by the constitution in the legislature; for if it is not, the result or emanation of authority derived from the constitution, it is not a valid law, and cannot influence the judgment of the court, in the decision of the question before them.

The legislature are the agents of the people, and, as such, can only move within those lines which the constitution has pointed out as the boundaries of their action; and if they should, inadvertently or unadvisedly, prostrate those barriers, the constitution selected the judiciary as the great breast-work to resist the oppression, and repair injuries which might accrue from such incautious or unintentional infractions of the constitution.

The following discrimination of the leading points, upon which the decision of the case must ultimately turn, will, perhaps, be useful to the court, in obtaining an accurate knowledge of the doctrine in dispute:

In the matter of J. L. Dorsey.

1st. The word "office," in the third article, sixth section, of the constitution of Alabama, does not include attorneys and counsellors at law.

2d. The act of eighteen hundred and twenty-six, for the suppression of the evil practice of duelling, is unauthorised by the constitution, as there is no provision in it, from which such a power is derivable.

3d. The authority of the legislature over the penal code, is a special, limited power.  Hence the repugnancy of the law to some of the exceptions or restrictions of the legislative authority.  Hence, too, its repugnancy to some of the affirmative provisions of the constitution.  Hence, also, a want of conformity to powers vested in the legislature by the constitution, or that the act in question is not authorised by any of those powers.

4th. If the court should be of opinion, that the act is within the constitutional power of the legislature, it cannot be construed to apply to attorneys and counsellors at law.

Let us investigate the affirmative provision of the constitution.  It is this: that the general assembly shall have power to suppress the evil practice of duelling, extending to disqualification from *office* or the *tenure* thereof, as they may deem expedient.—(Sixth article of the constitution, third section.)

It is contended, in the first place, that an *attorney* is not an *officer*, according to the plain and obvious meaning of that word ; and I flatter myself that the position is maintainable, according to the first principles of the constitution, that if the word does not embrace the functions of an *attorney*, that the act imposing restrictions on attorneys

In the matter of J. L. Dorsey.

is incompatible with the spirit and letter of the constitution, and therefore, inoperative and void.

It may be observed, as a general rule, that when a technical term is borrowed from an art or science, we look to that art or science to ascertain its import or signification.

In constitutions, technical expressions are, in some cases, absolutely necessary; so that they cannot be supplied by others, however forcible or clear; in other cases they have a determinate sense appropriated to them by use, in which, and in no other are they construed; and accordingly, we find many of our principles, precedents, definitions, and customs, are drawn from the English system of jurisprudence, which has furnished us sound and rational principles of civil liberty. Under it, our fathers lived and prospered, and from it they imbibed, and I hope I may say transmitted to us, that lively sense of individual rights, which is inculcated by its generous institutions. We must therefore refer to the English common law, to explain the technical language and the sound import of our laws and institutions. If we depart from this plain standard of interpretation, we set every thing afloat, and our constitution will become a mass of unintelligible matter.

If a statute of the legislature adopt phrases of the common law, we must look to the common law to ascertain their true signification. This is a rule of reason. It is the foundation of the principle quoted by Sergeant Pengelly from Hobart, that when a statute adopts a common law term, you take that common law in its common law meaning. It is the basis also of a para-

In the matter of J. L. Dorsey.

graph in one of the most luminous and masterly documents that ever emanated from the pen of an American statesman. I allude to the report of the Virginia legislature, in seventeen hundred and ninety-nine. This report expressly recognizes the retention of such parts of the common law, "so far as they are necessarily comprehended in the technical phrases which express the powers delegated to the government."—Here we find the recognition of the principle which takes common law phrases in the common law sense. Upon this basis, Judge Iredell, in the case of Fries, states, in effect, that the constitutional definition of treason, being borrowed from the British statute, the framers of our constitution intended to adopt the meaning of those terms, as expounded in the parent country.

Suppose an act of the legislature were passed, which said that a particular act should be *felony*, and said no more on the subject, where would you look for its true meaning? Will you not, by the adoption of that word, find it necessary to look at the source from which it was derived, (that is, the common law,) in order to ascertain its import? Will you not collate all the authorities which have expounded the doctrine of felony, and trace it up with patient, industrious perseverance, with the view *"petere fontes,"* to find its first spring? There is no other to which you can look for that purpose. Let us examine how these considerations bear on the point, and the meaning and construction of the words *office* and *attorney,* according to the common law of England, and English authorities applicable to the question.

It is a matter not to be controverted, that in England,

In the matter of J. L. Dorsey.

attorneys at law, are generally considered as officers of the court, in which they are allowed to practice. But this official relation, springs from the peculiar restrictions and privileges, with which they are, invested. In this country, attorneys at law are not recognised as standing on the same footing. In England, they cannot be bail " in civil actions," nor are they permitted to practice as solicitors in chancery."· They are also restricted as to other courts; and the qualifications required by the " several statutes of 4 Hen. 4 ch. 13—2 Geo. 2 ch. 27; are a wider and much more extensive character, than those existing in this country, and regulating the admission of attorneys. It may be further remarked, that the same restrictions as to practising law in the country *here,* do not exist, and are unkown to our statutes. The doors of all our courts are open to all who seek admission. In further illustration of these principles, it may be remarked that *serjeants* and *barristers* at law, are a distinct classification of lawyers, as recognized in England, take no oath of *"office,"* nor are they designated as officers of court. In England, it was decided, at a very early period of her judicial history, that *"attorneys"* were constrained to appear at the bar of the court. But since the days of my Lord Coke, that decision has been reversed, and it is a matter of mere choice, mere volition, with the attorney, whether· he will pursue his profession—(See Hargrave's Coke Litt. 294, 14 and 1 Salk, 27.)

In further illustration of this view of the question, it may be remarked, ·that formerly, no attorney could practice in the Exchequer, (being a court of inferior rank, not only to the court of King's Bench, but the court

7 P. ·                    39

of Common Pleas.) but through a clerk of court; but by the 1 W. 4 C. 70, S. 10 and 16, the court was thrown open to all persons admitted or admissible, as attorneys of the K. B. and C. P. But in no instance do we find any statute, authorising an attorney, to practice as a solicitor in chancery.

Thus, we perceive, that a clear and manifest distinction runs through the whole code of English law, in relation to the privileges and immunities of attorneys, counsellors at law, and solicitors in chancery. These restrictions are quite variant and dissimilar from the restrictions existing *here*. It is our freedom here, to be in a state of equality, so far as professional rights are implicated. In England, it is conceded, that attorneys are officers of the court. But this relation springs from the distinctions created by statutory provisions, as well as the exemption of one class of the profession from illiberal requisitions, and restrictions imposed on the other. But let it be admitted that they are officers of their respective courts, as in England, they are not public officers *here*. Indeed, without any appeal to learned authorities, does not common sense, the foundation of all authorities, of the laws themselves, and of the constitution, declare that an attorney is not an officer..

By the statute 25, Car. 2, ch. 2, all persons bearing any "*office, civil or military*," shall take the oath of supremacy. The language of this statute, bears a strong analogy to the act of eighteen hundred and twenty-six, and it would seem as if it were borrowed from that statute. But it may be observed, that the word office, as used in this act, is a generic term, of which an attorney is a species,

In the matter of J. L. Dorscy.

and therefore strictly comprehended by it. This objection cannot be sustained by any admissible rule of interpretation, or the production of any adjudicated case. As broad and as comprehensive as the words are in this statute, the judicial mind of England, has never attempted to give them that comprehensive scope and action, so as to embrace within their influence, attorneys and counsellors at law. The same course of reasoning is applicable to the corporation act of 13 Car. 11, statute 2. It was enacted, "that no person shall be placed in the office of Mayor, Alderman, Recorder, Bailiff, Town Clerk of the common council, in an *office* of *trust* or *profit*," who does not take the oath of supremacy. It would seem that if words of a general import and extensive signification, be susceptible of an enlarged expansion, comprehending every description of officers, that the phraseology employed in designating offices, in this statute, would certainly draw within its orbit, attorneys and counsellors at law. So thought the learned attorney general in England, but the learned judges before whom the case was brought for adjudication, decided otherwise, and maintained the broad and general doctrine, that an attorney was not an officer, within the clear and legitimate meaning of the act.—(L. Raym. 56, 98; Comyn's Digest —title attorney.)

These authorities are so clear, that they need no explanation. The text is as plain as any commentary can make it; and any decision adverse to the position established by those authorities, must rest rather on fallacious grounds, and illogical deductions, than any known or established rule of law.

Let us bring this question to another and severer investigation.

There are, says my Lord Coke, three causes of forfeiture of office. 1st. By abuser; 2d. Non-user; 3d. Refusal.

1st. Abuser; as by a sheriff permitting escapes.

2d. By non-user; in which there is this distinction; when the office concerns the administration of justice, the officer *ex-officio*, ought to attend without request, there by non-user the office is forfeited; but where an officer is *not obliged to attend, there can be no forfeiture*. But my Lord Coke makes another distinction,—that a non-user, of itself, without special damage, is no forfeiture of private offices, but that it is otherwise of a public one, which concerns the administration of justice.

Taking this exposition of my Lord Coke, in regard to the attributes of an officer, as well established, let us, however, in an enlarged and liberal view, which befits the subject, inquire in what manner a forfeiture of office was effected in England. In 4th Burr, 1919, it was held that general neglect or refusal to attend to the office is a reason of forfeiture. It has also been decided, that non-attendance is a cause of removal of a corporator. But how will you proceed to produce a forfeiture of an office? By information in the nature of a *quo warranto*, I am answered. It must be observed, that a *quo warranto* is the King's writ of right, and issues where a franchise is usurped, or forfeited by a *non-user*—(1 Bl. Com. 136;) (Finch's law, 37;) (3 Cr. Dig. 278.) If, then, it is not a royal franchise, no information in the nature of a *quo warranto* will lie. It has therefore been decided, that an

In the matter of J. L. Dorsey.

information of this kind did not lie in case of private rights, where no franchise of the crown had been involved.   It will not lie for erecting a warren—Rex vs Sir William Louther, (1 Stra. 637.)   Nor forfeiture of the place of Recorder by non-attendance—Lord Bruce's case, (2 Stra. 1161.)   Nor for claiming exclusive right of ferry —Rex vs Reynall, (2 Stra. 1161.)   Nor in the case of church wardens—Rex vs Doubency, (2 Stra. 1196;) which may be considered as a case strictly analagous to the present, and has again been decided in England since—(See 15 John. 369.)   Such information lies not for holding court leet, and the reason given is, that it is a private right, which may be tried in a civil action— Rex vs Caines, (Andrew's Rep. 14.)   This writ has for a long time been applied to the mere purpose of trying the civil right, seizing the franchise, or ousting the wrongful possessor, the fine being nominal only—(2 Inst. 281;) (2 Burr, 1817;) (4 T. Rep. 381.)   In England, courts will only grant this writ in cases of offices which are usurped against the royal power, or the public are interested—(2 Lord Raymond, 1409.)

If these decisions be correct, and recognized as well settled law, upon what intelligible principles will it be pretended that a forfeiture of a private office, a *mere franchise*, not springing from the legislative power of the State, can be produced—an office from which no special damage has been sustained.   The office of an attorney is strictly *private*, and not derivable from the legislature, consequently exempted from the operation of the writ of *quo warranto*, and strictly within the meaning of an office, as laid down with so much learning by my Lord

Coke. The argument upon this part of the question is thus, then, derived not only from the principles of that country, f om whence we derive many of the principles of our legal and political institutions, but from the constitution and laws of the State.

Offices are public or private; and it is said that every man is a public officer who hath any duty concerning the public, and that he is a public officer, who has to do with another man's affairs against *his will*, and without his leave—(Carthew, 478.)

But we are not to confine the investigation of this question, alone to definitions of English authorities. In this country, adjudications have been made equally as explicit, and decisive of the meaning of the word "office," as those already referred to.

In eighteen hundred and ten, the Legislature of Virginia, influenced by a high and commendable spirit, sought, by various enactments, to suppress the evil practice of duelling. The requisitions imposed by the act, are in all respects the very counterpart of the act adopted by this State. The oath has all the lineaments, all the rigorous exactions, of that prescribed by the Legislature of Alabama. The applicability of this act to *attorneys at law* was questioned, and ably argued before the Supreme court of that State—(1 Munford, 481.) The question was raised by Leigh, who refused to take the oath required by the act of eighteen hundred and ten. The case underwent a most elaborate examination, and it was decided by that learned bench. that *attorneys* were not *officers*, and consequently Mr. Leigh was admitted as a member, without complying with the requisitions of

In the matter of J. L. Dorsey.

the act of the Legislature.   The President  of the court, in delivering the opinion. observes, with a  great deal of legal discrimination, that  there  is no just  " ground on which we can erect, by implication or construction, into *governmental officers*, those who, in England, are not exalted to that character. and who, in the only books and doctrines handed down  to us on  the subject  from that country, and held. at most,  to be mere subordinate officers of their *respective courts*."   Here is an express decision in favor  of the position assumed in my  opening remarks, that the office  of an attorney was not a public office, neither in this or  in any other country, and accordingly, we find the  learned Judge discarding the requisitions imposed by the act  of eighteen hundred and ten, and allowing  the applicant to  become a member without taking the oath against " duelling."

It may afford some light, to inquire into the construction which has been  given to an analagous act, adopted by the Legislature of New York—(Sec. 31, ch. R. L. 416.) Upon examination, this act will be found to contain provisions, equally  as extensive  and  cogent, and  couched very much in  the same  phraseology, as  the  act under discussion.   The construction  given  by  the  Supreme court of  New  York,  to  the word office,  sustains, with great ability, the decision in 1 Munford, and is still more conclusive on the po'nt,  that an  attorney does not hold an office,  within the const.tutional meaning of the term. In the  language of the  learned  Judge  who decided the case, " that an  attorney or  counsellor  does  not hold an *office*, but exercises a *privilege* or *franchise*.   As attorneys or counsellors, they  perform no duties on  behalf of the

In the matter ot J. L. Dorsey.

government—they execute no public trust.    They enjoy the exclusive privilege of prosecuting and defending suits for clients, who may choose to employ them."—Again, the same learned Judge observes, " that physicians are licensed pursuant to statutes ; yet they hold  no office of public trust, in legal construction.    Lawyers are licensed to practice in one of the learned professions, and  physicians in  another ;  and there are  many regulations,  by law, for their government, as distinct orders of  men in society ;  but  they are not  trustees,  nor agents,  for the public, any more than  persons  licensed to carry on the business of banking"—(See 20 Johnson's Rep. 452.)

In 1 Bac. 287, Co. Litt. 52, an  attorney  is  defined to be one who is set in  the place of another, and he is either *public* as an officer of the government, or *private*, as an attorney at law, being delegated to act  for another, in private contracts or  agreements.    This definition is fully corroborated by the decision in 20th Johnson's New York Reports.    It is laid down by the enlightened judge who delivered the opinion, that the attorney exercises a mere *privilege* or *franchise*.

The word office, in the constitution of Alabama, is a term of  the most extensive  signification, .and comprehends almost every employment of  a public nature holden immediately from  the government, or  the  people themselves.    The constitution of the State of Alabama contemplates two classes of  officers ; the superior officers—such as the judicial and  executive ;  and  inferior officers—such as are created by legislation.

Now, to constitute an appointment,  there must be an appointing power.    There must also be a commission—

In the matter of J. L. Dorsey.

an acceptance. In the case of an attorney, from whence does his commission issue? Not from the executive—not from the legislature—not from the people. He receives his license from the court: but the licensing judges cannot be said to "elect" to "appo..." an attorney:— He can, perhaps, only be said to be appointed by the particular clients, who, after he is licensed, may severally employ him.

Now it must be conceded, that there is a wide and distinguishable diversity, between an office and employment. The question, investigated by these rules of construction, of the office of an attorney, seems to be nothing more than a *service* or *employment*, to be pursued by the attorney at his own will and pleasure; and springs from a much more paltry source of power, (if I may so express myself, without any disparagement to the profession,) than the office of a *solicitor, judge*, or the *governor*, or, if you please, the *sheriff*.

It may be remarked as a general principle, pervading the whole current of authorities, which have been consulted on this subject, that an office, *ex vi termini*, implies the delegation of a portion of the sovereign power of the State, and possession of it by the individual holding the office, and exercise of such power within constitutional limits, constitutes the correct discharge of the duties of such office. By giving this liberal and expansive construction to the word office, the meaning of the third section of the fifth article of the constitution, is apparent and conclusive, and the word office becomes intelligible, as to the extent of its import and operation.

Thus, then, it appears most conclusively to my mind,

7 P.                    40

that every office, implies an authority to exercise some portion of the sovereign power of the State, either in executing, expounding or administering the laws; and every office destitute of these great essential elements, falls within the *class of offices*, properly designated as an *employment* or *service*. In support of this view of the question, I will remark, that when the constitution speaks of offices, it means, surely, the legislative, executive or judiciary departments. It does not mean an occasional *employment*, such as jurors, attorneys, or printer to the State, or contractor, &c. &c., who are paid for some work done for the public service, or whose employment is disconnected from the functions of the government—but they intend an employment, permanent in its character, and implying trust and confidence.

I will now invite the attention of the court, to the doctrine of incompatibility of offices, as regards the constitution of the United States.

It will no doubt be observed by the court, that from the excluding provisions, pervading our State constitution, that the framers of it must have had a full knowledge of the offices, then held and exercised under the federal government. The framers of our State constitution, provided against the offices, as they then existed, and were exercised under the federal government of the United States, at the adoption of the constitution, and made them incompatible with certain enumerated offices of the third article, section twenty-six, of the constitution.

Establish the point, that an attorney is a public officer, what is the result flowing from such an extravagant

In the matter of J. L. Dorsey.

and inadmissible position? Why it is this! That every *attorney* who obtains admission into the federal courts, is converted *eo instanti*, into an officer of the federal government; and is thus in a state of partial *disfranchisement*. We cannot act in Congress, in the State legislature, or in the electoral colleges. In the view of the constitution, he is an object of jealousy; although he can, at any time, be restored to all the franchises of a citizen, by abdicating his office again. The constitution of the United States contains the same salutary provisions for analogous beneficial objects. The inhibition, on this point, is positive and unbending, that individuals holding offices under the State government, shall not be eligible to offices under the federal government. Even in the government of England, the same doctrine prevails, as regards the discrimination in offices; the offices of excise and customs, and clerks or deputies in the treasury, navy, victualing and admiralty offices, and a long list of other dependants on the crown, are interdicted from being elected or sitting as members of the House of Commons.

Having endeavored to maintain the position, that an attorney is not an officer, I will proceed to show to the court, that the act imposing restrictions on attorneys, is not a measure, emanating from the constitution.

I shall contend, in the first place, that this act is an assumption of legislative power, not warranted by any provision in the constitution; and secondly, that it is repugnant to several clauses contained in that instrument; or, in other words, rides over and prostrates all the restrictive clauses, so wisely incorporated in it for the most beneficial purposes.

In the matter of J. L. Dorsey.

It is admitted as a general proposition, that every power contained in the constitution, unless limited, is entire, exclusive and supreme. But the legislature is circumscribed in its capacity, by the fundamental law of the constitution, and its action must conform strictly to its limitations. The powers of the legislature are defined and limited; and that those limits may not be mistaken, the constitution was written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if those limits may be passed by those intended to be restrained? The restriction between a government of limited and unlimited powers is abolished, if those limits do not restrain the persons on whom they are imposed, and acts prohibited and acts allowed, are of equal obligation. It is a proposition too plain to be contested, that the constitution repudiates any legislative act repugnant to it, or that the legislature may alter the constitution by the adoption of an ordinary act.

Between these alternatives, there is no middle ground. The constitution, it must be admitted, is the superior, paramount law, unchangable by any ordinary acts of legislation, or is it on a footing with ordinary legislative enactments, or like other enactments, alterable when the legislature shall deem it expedient to incorporate in it, reformatory principles?

If the first portion of the alternative be correct, then a legislative act contrariant to the high commandments of the constitution, is not law : if the subsequent portion be compatible, then written constitutions are preposterous attempts, on the part of the people, to restrain a power in its own nature illimitable.

In the matter of J. L. Dorsey.

The constitution of the State of Alabama, contains a specific enumeration of powers, as applicable to every appropriate object, which may become the subject matter of legislation, and it is contended, that the legislature cannot resort to argumentative implication, with the view of drawing to itself a larger mass of power, than was designed by the framers of the constitution, should properly belong it.

If, therefore, the legislature have not this power, by any specific grant contained in the constitution, nor embraced in its ordinary legislative powers; nor by contemporaneous exposition; on what basis would the authority to pass a law not warranted by its tenor or spirit, rest, even if there were no special prohibitory clauses in the constitution, or the declaration of rights.

It may be said, that the act of eighteen hundred and twenty-six, was an incident of sovereignty, an inherent power. In this country, there is no such thing as totality of sovereignty. All sovereignty emanates from the people, and it is controlled and modified in its action by the creating power. Hence it is, that every legislative deflexion, from the life-giving principle, from the constitution, is considered a nullity, and at variance with the cardinal principles upon which a republican government is founded. Is the act of eighteen hundred and twenty-six a legitimate act, flowing from some given power, by necessary implication? To derive such transcendental power from implication, would be to change the subordinate into the fundamental; to make the implied powers greater than those which are expressly granted, or to change the whole theory of the government. The doc-

trine, that dormant, potential powers exist in the constitution, to be called into action whenever the legislature may deem it necessary, is dangerous in the extreme, and fraught with appaling consequences to constitutional liberty.

That the constitution is the paramount law, and that acts of legislation are subordinate to it, cannot be denied; and the consequence is, that where they cannot be reconciled—where both cannot be executed, the courts, when called upon to declare the law, must give effect to the constitution, and annul the act, which would violate and defeat it. This, however, is a high exercise of power, and should always be exerted under a profound sense of the responsibility assumed by the court, with a deep respect for the legislative body, and anxious desire to give effect to both acts.

The judicial history of the country abounds in decisions declaring an act repugnant to the constitution, *ipso facto,* void. Thus, in the case of the People vs Platt, (17 Johnson, 195,) the Supreme court held the law to be unconstitutional. It has also been decided in Maryland, (1 Harris & Johnson, Whittington vs Polk,) that a statute not made in pursuance of the constitution, is void. So, also, in Marshall's Kentucky Reports, (Ely vs Thompson, 73;) the Trustees of the University of North Carolina vs Foy & Bishop, (1 Murphey, 58;) the case of Whitman vs Hapgood, (10 Mass. R. 437;) (1 Haywood's R. 29, 30.) So, also, in the Superior court of Georgia, Greenfield vs Ross, (Charlton's R. 176—2 Littell's R. 92:) That the act of the legislature interdicting the carrying of arms, was unconstitutional. This section is analogous to the

In the matter of J. L. Dorsey.

twenty-third section of the declaration of rights. Has the legislature the legitimate power under the constitution to suspend any part of the general law, limiting its suspension to any individual, and leaving the law still in force in regard to every one else. The doctrine has been repudiated—5 Pickering, 69. If they have not the right to relax the rigid muscles of the law, in individual cases, have they the power of enacting laws operating on distinct and separate classes of the community ?

I am aware that the proposition is usually laid down in more restricted terms by elementary writers, and is more confirmed in its general language. It is the first principle of the jurisprudence of a free people, having written constitutions, that legislation must be general in its action, and not individuated.—(1 Touallier, 96—Montg. De Loix, Liv. 11, ch. 6, Liv. 6, ch. 5.)

It is contended that no government is warranted in enacting exceptional laws—striking at one class of citizens, and depriving them of the benefit of the law common to all the rest. The sovereign people of Alabama have committed no such power to the legislature. A legislature would be the most dangerous of all despotisms, if it may single out one class of individuals, and deprive them of all the benefits of our system of laws, in exclusion to others, or make one class of citizens, the victims of its policy, when others, are untouched by its action.

There is a class of laws, which are extraordinary, exceptional, and prepotent, *ex necessitate rei ;* such, as laws of revenue, limitation, insolvency, usury, divorce, and the like : now, can the act in question, rapacious as it

is—exceptive, arbitrary, unjust, impolitic and odious,—
be constitutional? Passing from principle to authority,
it has been decided, in 3d Peters, 280—(Jackson vs Lam-
phire,) that a constitutional power, *unreasonably* exercis-
ed, is void.

In England, where there is no written constitution,
acts of Parliament, contrary to natural equity—such as
make one a judge in his own cause—are void. (Day vs
Savage—Hob. 87.) So, also, statutes against common
rights, are void. This doctrine is sustained by a num-
ber of English authorities—(8 Coke's Rep. 118—10 Mod.
89—Bac. Ab. title Statute—1 Black. Com. 62—also deci-
ded in 2 Dallas, vs. Vanhorne & Dorrance.)

This obnoxious act, it is urged—

1st—Violates universal law or common justice.

2d—The constitutional or organic law of the Federal
Union.

3d—The constitutional or organic law of the State of
Alabama.

In other words, it violates natural and constitutional
law.

It is most true and incontrovertible, that the legisla-
ture have the power to mould its penal laws, so as to
subserve the purposes of civil society, and regulate and
control the moral conduct of those subject to its action;
but have they the constitutional power to adopt any
system of measures, which strike directly and uproot
fundamental principles, obliterate all the landmarks of
natural justice, and annihilate those rights, which exist,
independently of law, or any organised government.—
It will no doubt be conceded, that every right must be

In the matter of  J. L. Dorsey.

subjected to, limited, and interpreted by the law of na-
ture, which every where forms a part, and the best part
of the municipal code; and it is the primary canon of
that code, that necessity, physical necessity, knows no
law but itself; or, in other words, that a moral right,
that is not productive of results detrimental to the inter-
ests of society, or contravening any fundamental law,
may be exercised, and any legislative measure, viola-
tive of that right, is subversive of the whole social poli-
cy of our political system. It is destructive of the ends
of society, and scatters discontent in every soil, in which
false doctrines may be sown. All free governments are
founded upon the principles of the social compact,—and
all measures adverse to its social action, must necessarily
partake of tyranny and oppression. Under the general
power of protecting society from abuse, and establishing
the social system, the legislative power in question, may
be claimed. Let us see whether it is not a plant un-
congenial to the soil of the constitution. It is a matter
too well established, to require any argument, that in
the constitution, no particular kind of property is men-
tioned, or specifically assured to its owners. The con-
stitution intends to secure all kinds of property to its
owners, against the power of the public to take it away.
without compensation—a fundamental principle of all
governments in existence—a principle, which Louis XIV,
or Napoleon, in the plenitude of their power, durst ne-
ver assail. These doctrines, it is maintained, are strict-
ly consonant to our laws and institutions; because they
are in keeping with that theory of absolute right, inhe-
rent in every bosom,—that of property—which consists

7 P.                     41

in the free use, enjoyment, and disposal of all acquisitions, without any contraction or diminution.    As these rights consists primarily, in the free enjoyment of personal security—of personal liberty and private property—so long as these remain inviolate, the citizen is  perfectly free ; for every species of compulsive tyranny and oppression, must act in opposition  to one or other of these rights— having no other  object  upon which it can  be properly employed.

The doctrine  will  not be contested, that the legislature  may settle the course of  descents of land ; the nature,  extent, and  qualification of  estates;  the manner and form of acquiring estates ;  the solemnities and obligations of contracts ; the rules for the exposition of wills and deeds, &c. &c.   But would it not be an absurd proposition to maintain,  and in opposition to all the principles of natural justice, to say, that the power of regulating and transferring property,  would authorise  the  legislature to enact a law, requiring of the heir, before he received his inheritance,  to take the  oath  against dueling,  or place him under  some other restrictions equally objectionable, and  incompatible with  his rights  to the enjoyment of this property.   If the legislature have  the right to do this, does it not  drag with it  as a necessary concomitant, *ex consequenti*, the  other, and much  more consequential right, of restricting the income of the heir? The legislature have the power to enact laws relatively to the  marital relations—to say that the  parties shall not marry within a certain degree of consanguinity, and without obtaining a license—so, also, to liberate the woman entering  into wedlock,  from  being  arrested for

In the matter of J. L. Dorsey.

debt, and restricting her as regards the privilege of making contracts; but would not a law, depriving her of the privilege of taking lands by descent, gift, or device, or imposing such exactions—in their nature impossible to be complied with—be held inimical to the holy ordinance of matrimony, and in violation of justice and social policy.

It is true, a man, by entering into civil society, acquires the privilege of being protected by that society ; and he renounces the privilege of seeking, by his own force, redress, for his injuries, because incompatible with his obligations to society. But he does not renounce the privilege of defending himself against personal violence. The legislative department, also, have the regulation of the rights and privileges of a voter, as to require residence, &c.—but would not any requisition, requiring any large amount of property to be possessed by the voter, before he is entitled to a vote, or to take an oath, abjuring, in advance, against the perpetration of an act, be considered an infringement of those rights, which every freeman must hold dear and inviolable.

How stands the case with an attorney ? Are not the restrictions severe and rigid ? Are they not at war with justice and common rights? Do they not deprive an individual of his office, if he perpetrates an act that is not punishable ? Are they not, in their character, in opposition to every thing like justice, and restrictive of those rights, with which every man is clothed, with the view to the obtention of his happiness, which is the true basis of all law ? I cannot conceive the grounds on which the opposing argument can be supported. Then, I con-

tend, that the principle, I have endeavored to maintain, in relation to the limitation on the legislative power over this question, is fundamental. It is deeply inlaid in all enlightened political systems: it is supreme—it is sovereign: it will "bear no rival near the throne." It detrudes all opposition from its presence.

Transfer all these inherent, unalienable rights, to the law-making power of the government, and it would be of all the effects of a defective organization, the most afflictive and destroying. As well might the blazing orb of day, when sent to warm us, absorb, as it does, the moisture of the soil, and the providential dews of night not return it, and yet the fructification of the earth, and the gathering of its fruits be hoped for—as to expect the full enjoyment of constitutional liberty, when these great cardinal rights are obliterated and swept into one common reservoir of legislative discretion.

It may be remarked, that the right of regulating our own pursuits, the right of protection of society, and the right of property, are three twin sisters, born of the same common mother—natural law. They came into being at the same moment, with the existence of natural law—they continue during the same period while natural law continues; and unlike the twins of heathen mythology, they die at the same instant when natural law ceases "to move, live, and have its being."

I have thus taken a full review of these propositions, and I trust some, if not all the points that I have contended for, are decidedly in favor of my views in relation to the constitutional validity of the act in question; there is one more, however, as it rests not only on the plainest

principles of reason and justice, but on a concurrence of all the authorities on the subject, is too clear to admit of a doubt, and were the case of less magnitude, I should deem it unnecessary to submit any other to the court.

It may be attempted to deduce the power in question from the word "*shall*," and *extending* to disqualification from office—(Third section, sith article.)

Let us proceed to the examination of its meaning. To ascertain this, we must compare all the provisions of the constitution, containing words of the same import. This is the general rule of construction of all written instruments, and results from the principle, that such instruments are the only evidence of the will of the maker.

Now, it is contended that "shall" is merely a sign of the future tense, and not imperative. It may be urged, that the words *shall* and "*extending*," are equivalent to the words "may extend," and that "*extend*" means to widen to new cases not before within the scope of the powers. As the mode is not limited, it may extend to all cases, in any form in which legislative power may be exercised. These doctrines do not suit upon general reasoning, plain and obvious as they may seem to be.

If the court are disposed to give to these words in the third section this enlarged construction, what meaning will you attach to analogous words in the third section, under the head of impeachments. The words are, that "the governor and all *civil officers* shall be liable to impeachment for any misdemeanor in office; but judgment, in such cases, *shall not extend* further *than removal* from office.

Now, give to these words "shall" and *extend*, the expansive interpretation, as claimed under the third section of the sixth article of the constitution, and is not every civil officer in the government, triable and impeachable for every *misdemeanor?*

If an attorney is an officer of the government, then he is liable to impeachment for any violation of law, impeachable and triable I presume, by the same body, as the judges. Is an attorney impeachable for every misdemeanor? This position no doubt will be denied. It must be an indictable offence. But suppose it is not indictable, is he to be impeached and deprived of his office, when he has done nothing which the laws of his country prohibited? Is not deprivation of office a punishment? Can there be punishment inflicted where there is no crime?

Now examine the act of eighteen hundred and twenty-six, and see if it does not conflict, in a very striking point of view, with the principle, which I have endeavored to establish, in relation to impeachments. The act says, " that if any one sends a challenge," he shall be disqualified from office. This court has decided, that the sending of a " challenge" *is not a punishable offence.*—(Smith vs. The State—1 Stewart, 506.) The individual is not even guilty of a misdemeanor ;—yet he is visited with all the disabilities of the act. It is admitted, in this decision, that he has violated no law—committed no offence. Then the point is this : Is an individual to be deprived of an office, for the commission of every *folly*, error or indiscretion, too insignificant to have a name in the penal code—*too* paltry for the notice of our inferior courts?

In the matter of J. L. Dorsey.

Thus, we find, upon the strictest analysis, that there is nothing in this clause of the constitution which authorizes the exercise of this power; and the court cannot remove a limitation, where the people have been disposed to create one. In the construction of this section, the legal maxim applies—*expressio unius exclusio est alterius*.

It is most obviously conclusive, from the reading of this section, that the constitution intended to declare a great fundamental principle, leaving it to the judgment and conscience of the legislature, so to apply it, as to secure the most benefical results to society.

In support of this power, it may be argued, that where a general power is given by the constitution, the means of effecfuating it belongs to the legislature. To this, I reply, that there is an obvious distinction between those means which are incidental to the particular power, which follow as a corrolary from it, and those which may be arbitrarily assumed, as convenient to the exercise of the power, or usurped under the plea of necessity. These restrictive words, founded on *reformation, and not on vindictive justice*, (sec. 19, art. 6,) we contend, were inserted to define the powers of the legislature, with the utmost precision and accuracy.

I lay it down as a fundamental proposition, that in a government of prescribed and limited powers, no public functionary, no department of government can assume a power which is not to be found in the constitution, or exercise any authority repugnant to its provisions.

It is also contended, that the act is repugnant to the ninth article of the constitution. Under the head sche-

dule, it says, "that every white male person, who shall dwell within the limits of the State, at the time of the adoption of the constitution, and shall be otherwise qualified, shall be entitled to hold any office or place or honor, trust or profit, under the State, *any thing in this constitution to the contrary, notwithstanding.*

It is also contended, that the law of eighteen hundred and twenty-six contravenes the tenth section of the declaration of rights. It says, that *no man shall be deprived of his life, liberty, or property, but by due course of law.*

There is no doubt but the convention intended this clause as a restriction on the legislative branch of the government. It cannot be disguised, that the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment; and that the people of the State, in adopting that instrument, have manifested a determination to shield themselves and their property, from the effects of these sudden and strong passions, to which men are exposed. The restrictions on the legislative power of the State, are obviously founded in this sentiment.

This clause in the bill of rights seems to be taken from the twenty-ninth chapter of *Magna Charta.* An elegant commentator on the laws of England, says this chapter is the corner stone of English liberty. The origin and history of *Magna Charta* is familiar to lawyers and politicians. It was intended to limit the power of the crown, and check encroachments on the liberty of the subject.

If the attorney has a vested interest in his office, is an act of the legislature depriving him of it, repugnant to the tenth section of the declaration of rights? Does it

In the matter of J. L. Dorsey.

not deprive him of it, *without due course of law?* The learned Bracton, in his explanations of *Magna Charta*, defines due course of law, to be a judgment—a verdict of equals. Sullivan expounds the words—a proceeding to judgment in a court of justice—(In 2 Inst. 60, 61)—Due course of law, as that phrase has been understood ever since *Magna Charta*, means a correct and established course of judicial proceedings.

The Supreme court have also decided, it means all judicial proceedings whatever—Bank of Columbia vs Oakly (4 Wheat. 244.)

Let us now submit the act of 1826 to a rigid philological analysis.

There is no principle, better established than this, that all penal laws are to be construed strictly. It arises out of the frailty of man—out of a tenderness for individual rights, and a sensitive regard for the liberty of those on whom they operate. The law may be said to weep over the misfortunes of its victims.

The first section describes more specifically, the persons who are objects of the law; points out the particular officers, *eo nomine,* who are required to take the oath against duelling:—"attorneys and counsellors" at law are enumerated in the first section. That a law is the best expositor of itself—that every part of the act is to be taken into view for the purpose of discovering the mind of the legislature—and that the details of one part may contain certain regulations restricting the extent of general expressions used in another, but of the same act, are among those plain rules laid down by common sense, for the exposition of legislative acts, which have been uniform-

7 P.          42

In the matter of J. L. Dorsey.

ly acknowledged. If, by the application of these rules, it shall appear that the words used in the second section of this act, to wit, the words "*public function*," be irreconcilable with the words of the preceding section, "attorneys and counsellors," the latter words are to be rejected as surplusage, as mere *expletives*, and the words in the second section to prevail and control the interpretation of the whole act. This is done with the view of preserving the integrity and symetry of the law. Will it be seriously contended, that the word "function," in the statute, is NOMEN GENERALLISSIMUM, and will of course embrace officers of every possible description known to the law? This is inadmissible—it is decided otherwise by the Supreme court of the United States. The language of the act of Congress is: "any collector of the revenue, receiver of the public money, or any other officer who shall have *received the* public money before it is paid into the treasury of the United States." Under this language, it was decided that a purser of the navy was not an *officer*, and this decision is based on the restraining words in the subsequent section of the act—(See 9 Peters, 20.) Now give this word *function*, in the second section, the same liberal construction, as also the subsequent words in the first section of the act—"*during my continuance in office, or in the service of any public function*."—The framers of this law could not have contemplated, that an attorney *was an officer*. In the latter part of the first section, and in the whole of the second section, the words "attorneys and counsellors at law," are dropped, seemingly, *ex industria*. From this difference of the phraseology, perhaps a difference of legislative intention

In the matter of J. L. Dorsey.

may, with propriety, be inferred.   It is hardly to be presumed, that the variation in the language could have been accidental.   It must have been the result of some determinate reason, and it is not very difficult, indeed, to find a reason sufficient to support the apparent change of intention.   Then, give these restraining words their full meaning, and these jarring and discordant provisions of the act of the legislature are reconciled, and harmonized into uniformity.

I have thus, in a very imperfect manner, laid before you my views, in relation to the matter under discussion. It is a new and interesting question.   I leave it to stand on those principles, which I have presented in my argument.

Mr. *Henley* said—The questions presented for consideration, are—was the act, containing the oath, passed in accordance with the powers conferred upon the Legislature, by the Constitution ?—or, can the oath be properly required of the several classes of persons mentioned ?— And upon a refusal to take the oath, are they legally *disqualified* for the several offices, stations, and public functions mentioned ?—or if an attorney or counsellor at law, for the practice of that profession ?

It will be observed, that the act under consideration, is strictly *penal ;* as is also, the section in the constitution, (section three, article six,) under which it is pretended the power was derived to pass it.   This being true, in the application of the law, to the several classes of persons mentioned, it must, consistently with the rule that universally prevails in relation to all criminal law,

In the matter of J. L. Dorsey.

be rigidly and strictly construed, and not extended beyond the plain import of the language employed. In the discussion of this question, therefore, it will be necessary first, to examine into the extent of the power conferred upon the legislature by the constitution, in imposing punishments, or inflicting penalties for the commission of crimes or misdemeanors; and also into the mode in which this power can be applied.

The framers of our constitution have expressly provided, in the nineteenth section of article six, of that instrument, that " it shall be the duty of the General Assembly, as soon as circumstances will permit, to form a penal code, *founded on principles of reformation, and not of vindictive justice.*" And again, in section sixteen, article first, of our own constitution, as well as in article eight, of the amendmenrs to the constitution of the United States, it is provided, that " cruel or unusual punishments shall not be inflicted." There are some other sections and clauses in the constitution, applicable to a particular portion of this subject, which will be adverted to, and commented on, below. These will be sufficient to shew, as well the prevalence, as the importance of the rule, that the power of the legislature, in creating offences, and imposing penalties, is not universal and unlimited, but that it is guarded and controled by the constitution, in accordance with those rules and principles, which reason dictates, humanity sanctions, and justice approves.

But, not only is the legislature limited in the extent, to which it can go, in inflicting, but it is also confined, as I shall show presently, in the selection of the nature

In the matter of J. L. Dorsey.

and quality of its penalties.   It is unnecessary to speci-
fy all the different penalties or punishments which *can
be legally and constitutionally inflicted*; and it will be
sufficient, merely to say, that *fine* or *imprisonment*, or
both, are imposed in a great majority of the cases; to
which is added, for some offences, a *consequential* penal-
ty, of *disqualification for office*, and exclusion from some
of the rights and privileges of a citizen, to which I shall
advert.    These are the sanctions of the law, under the
authority of the constitution, given to enforce obedience
to its mandates, by punishing the offender for their
breach.

I think it is clear, that whenever the disqualifying
power is claimed or exercised by the legislature, the au-
thority must be derived from an *express* grant in the
constitution, or fundamental articles of government—or
else the act is null and void.

It will next be necessary to ascertain in what cases
the legislature *can* exercise its disqualifying power—and
afterwards, *to what extent* it can be carried; and in con-
clusion, examine *into the mode* in which it has been ap-
plied.

By reference to the constitution, it will be seen that,
in section three, article six, it is provided, that "the
General Assembly shall have power to pass such penal
laws to suppress the evil practice of dueling, *extending
to disqualification from office*, or the tenure thereof, as they
may deem expedient."

In section four, article six—" That every person shall
be *disqualified from holding any office or place of honor or
profit*, under the authority of this State, *who shall be con-*

In the matter of J. L. Dorsey.

*victed of having offered or given any bribe* to procure his election or oppointment."

And again, in section five, article six—that " Laws shall be made *to exclude from office, from suffrage, and from serving as jurors,* those who shall be hereafter convicted of *bribery, perjury,* and *forgery,* or other high crimes or misdemeanors."

These are all the grants of power contained in the constitution on the subject of disqualification, except in cases where an impeachment lies ; and to them alone, must the legislature look for its authority in the enactment of such laws.

The crimes then, for which disqualification can be produced, are, *bribery, perjury, forgery,* and *dueling*—and " other high crimes or misdemeanors" seem also to be included.

It is, perhaps, unnecessary to discuss here, at length, the effect of the last clause—" and other high crimes or misdemeanors." It will be sufficient merely, to say, that as this section is highly penal in its operation, it should, according to the well settled principle of law, be rigidly and strictly construed ; and that the specification of the crimes of *bribery, perjury, forgery, and dueling,* by name, completely annul the last clause, and restrict the legislature to the enactment of disqualifying laws, to those offences only.

The next question presented for consideration, is, *from what* can the legislature exclude a citizen, for the commission of the offences above mentioned? Is the power conferred, general, unlimited, and uncontroled ?

The point, that the grant of specific powers, in a con-

In the matter of J. L. Dorsey.

stitution, amounts to a reservation of those not delegated, is too well settled,  as a constitutional  and essential principle in republican governments, to  require any argument to sustain it.    In truth, so important was it regarded, and so fearful were the framers of our constitution,  that it might be forgotten or disregarded, in the turmoil and confusion of party strife, that it is expressly and emphatically declared, in the last section of our declaration of rights; and it is further provided, that all laws passed in contravention of it, are  null and void.— This is more  especially true, and important, in  the application of the power of the legislature, in cases where the liberty of the citizen is involved;  and it is expressly provided, in the last clause of section ten, article one— and in section . eleven,  article one, (Constitution) that no citizen shall be deprived of his liberty, or be accused, arrested, or detained, but in cases  clearly ascertained and defined by law, and  according to the forms which the same has prescribed.    The word "liberty," used in this case, is not confined to the mere freedom from arrest and confinement in prison;  but  it has a  more enlarged and extended signification, and  embraces all the  privileges and franchises which it is the  object and  intention of good governments to secure to the people.—(2 Bl. Com. 37.)    Once admit the general power of the legislature to curtail or abridge the privileges of the citizen, without *expressly delegated* authority, and it would be difficult for the  imagination to conceive or  grasp the evils to which it would tend.

I regard it as fully established,  that the legislature *cannot extend its disqualifications any further than to office,*

In the matter of J. L. Dorsey.

*suffrage, and serving on juries*, even though the guilt of the individual disqualified, if separated into its appropriate parts, would fill the whole catalouge of crime.

If the legislature can prescribe one qualification other than those that harmonize with the general and prevailing spirit of the constitution, the right is equally clear to prescribe a hundred. It may thus go on, contracting the circle of those who can take any part in the government, or enjoy any of the rights, privileges and franchises of citizenship in the State, until in the end, the very form of the government itself would be changed, and from a republic, be converted into an oligarchy. The qualifications which it is admitted the legislature has a right to prescribe, are easily defined. The definition of the word itself, conveys, perhaps, the clearest idea of what is intended. Webster defines it to be " a natural endowment or acquirement which FITS a person for a place, office or appointment, or enables him to sustain any character with success." It is, then, a *fitness* for a correct and proper discharge of the duties belonging or pertaining to any particular office, station, or appointment, or for the exercise or enjoyment of any right, privilege or franchise. When the requisition extends beyond this, it ceases to be a *qualification*, necessary for the place, station, office, &c. and is immediately merged in its opposite of DIS-qualification, and the object and intention must be to *exclude*, even those who are *qualified*, according to the plain meaning and construction of the word. Upon reference to the constitution, we find that this idea is preserved throughout all its provisions. Wherever the qualifications necessary for the discharge

In the matter of J. L. Dorsey.

of the duties of any office, station or appointment, are men-
tioned and prescribed, they are such as refer solely to the
*fitness* of the individual, for the particular duties required
to be discharged. Age and residence are the principal qual-
ifications required; the one, founded on a presumption of
sufficient talent and experience—the other, of an interest
in, and attachment to the country; both together, justi-
fying the expectation that the duties will be properly
and faithfully discharged. It is for this reason, that the
law requiring the production of a license, before an in-
dividual can be permitted to practice as an attorney or
counsellor at law, or of a diploma or license, before en-
tering on the practice of medicine—is clearly constitu-
tional. For the practice of either of these professions,
without serious injury to the community, certain quali-
fications are required, which are not necessary in other
cases—and as there are certain privileges attached to
them, it is but right that those who enjoy the privileges,
should possess and furnish the evidence of their qualifi-
cations. So, also, wherever the constitution provides for
the DIS-qualification of certain persons for office, &c. it is
only in those cases where the very nature of the act or
offence committed shows the individual disqualified, to
be *unfit* for the proper and faithful discharge of the duties
of the office, station or appointment, &c. For instance,
one convicted of the crime of perjury, is disqualified for
serving on a jury—for having once totally disregarded
the obligation of an oath, he has shown himself to be
*unfit* to be trusted with the disposition of the life or pro-
perty of another man—as he may, notwithstanding his
oath when sworn on the jury, make up his verdict from the

7 P.                               43

most corrupt motives. But it would scarcely be contended, I presume, that a physician or an attorney would be any the less able or qualified to manage and conduct the case of his patient or client skilfully, though he may have been convicted, not only of perjury, but also of a dozen other offences of a similar kind. Under this view of the subject, I should pronounce a law disqualifying an individual for the practice of either of these professions, on conviction for any offences of this character, to be clearly unconstitutional.

The foregoing views are more especially correct, and more plainly applicable, *where the office, privilege or franchise is not of legislative creation.* Where the legislature creates or originates the office, privilege or franchise, it is *possible* that it may prescribe such qualifications, or more properly annex such conditions as it may deem expedient. I state it as *only possible,* for even in such cases, it seems that the spirit that pervades all republican governments, would require that only such qualifications should be prescribed, as imply an adaptation or fitness for the office to be filled, or the privilege or franchise to be enjoyed or exercised.

With those offices, stations, &c. that are of *constitutional origin, and those natural rights and privileges that are co-eval with man, and those franchises that are co-existent with, and form a necessary part of the law itself,* it is perfectly apparent that the legislature is restricted in the requisition of qualifications and the annexation of conditions to those things that imply a *fitness or adaptation* to the office, privilege or franchise. When, therefore, the legislature, in the enactment of laws prescribing the

In the matter of J. L. Dorsey.

qualifications necessary for any office, station, or appointment, or the enjoyment of any right, privilege or franchise, con ines the qualifications to those things which are necessary for the proper and faithful discharge of the duties pertaining to such office, &c. the law is clearly constitutional. But where it goes beyond this, and requires the possession of other and extraneous qualities, it amounts, *pro tanto*, to a *disqualification;* and unless the power is plainly conferred by the constitution, it is against the spirit and letter of that instrument—in opposition to the genius of republican governments—in contravention of natural right, and consequently, null and void.

Upon reference to the digest, it will be seen that an act was passed on the eleventh of November, eighteen hundred an l four, while the country was yet under the Mississippi territorial gover m e t, which, a ter reciting, by way of preamble, " that from a false sense of honor," &c. " the practice of duelling had obtained a great prevalence"—enacts that " If any person or persons shall deliver, offer or send any challenge in writing, verbally, or otherwise, to fight a duel, or shall accept such challenge, or shall fight a duel, and neither of the parties be killed, or shall be the bearer of such challenge, knowing the same to be such, the person or persons so offending, their aiders or abettors, and each of them, shall, *on conviction thereof*, be fined in the sum of one thousand dollars, and be imprisoned twelve calendar months, and be rendered incapable of holding any office of honor, profit or trust, under the government of this territory, for and during the term of five years, *from the time of such conviction.*"

In the matter of J. L. Dorsey.

Here, it will be observed, that the offence consisted not only in the actual fighting of a duel, but also in the giving, accepting, or knowingly carrying a challenge, or aiding or abetting in either of these acts, though no duel was actually fought.

It will be observed, too, that the penalties were only made to take effect upon a *legal conviction*, and that the disqualification for office, *was dated only from that time.* This conviction, too, was taken as the only evidence of the commission of the offence, as no oath was required. This act remained in force until eighteen hundred and nineteen, and until after the adoption of the constitution, when an act was passed repealing the act of eighteen hundred and four, and providing that " If any person or persons, be engaged either as principals or seconds, in fighting a duel, or in other words, fighting in single combat with any deadly weapons; the principals and seconds, and every person or persons directly or indirectly engaged or concerned therein, either in sending, giving, accepting or conveying any such challenge, knowing or believing it to be such, their counsellors, aiders or abettors, *upon being thereof lawfully convicted*, shall be imprisoned, &c. and he or they shall be forever disqualified from being a member of either branch of the legislature, and from holding any office or appointment of profit, honor or trust, either civil, military, or otherwise, in or under the authority of this State." To this law was appended an oath, which was re-enacted in eighteen hundred and twenty-six, with only a variation as to the time to which the oath should extend back. Here, it will be observed, that the mere act of giving, accepting

In the matter of J. L. Dorsey.

or carrying a challenge, when no duel is fought, is not included or punished,—the law of eighteen hundred and four, making it an offence, having been repealed.— There is no doubt that the legislature had *the power* to make either of these acts a misdemeanor or crime, and to have punished the offender, if it had been "deemed expedient,"—but it seems that they thought it inexpedient, and for this reason, repealed the act of eighteen hundred and four, creating and punishing the offence. It will be observed here, too, that like the act of eighteen hundred and four, the punishment is only made to take effect *upon a legal conviction.* It is also important to observe, in relation to this law, as it is the one now in force, that in that portion of the act "*extending*" the punishment to *disqualification*, it is *confined to* a seat in either branch of the general assembly, and to offices or appointments of profit, honor or trust, AND THAT THE PROFESSION OF THE LAW IS NOT INCLUDED, *and that consequently, the disqualification cannot, by any construction, be made to extend even on conviction, to that, unless that profession can be embraced in the general expression of "any office or appointment of profit, honor or trust."*

Thus far, this law is in strict accordance with the power conferred upon the legislature by the constitution, and strictly comports with the views of natural and constitutional right. It clearly recognizes the principle contended for above, that no punishment, however small, can be inflicted, without a legal conviction. It founds the three species of punishment inflicted, of *fine, imprisonment, and disqualification* for office, *alone* "upon being THEREOF LAWFULLY CONVICTED." Had the law been en-

In the matter of J. L. Dorsey.

ded at this point, or had the succeeding sections been in accordance with the spirit that prevails throughout this, not a doubt could have existed as to its constitutionality. It would have been within the very letter, as well as the spirit of the section in the constitution, under which it was enacted. It is a "penal law," intended "to suppress the evil practice of duelling," imposing a fine and imprisonment for a commission of the offence, and "extending" the punishment, "to disqualification from office." It operates alike upon all classes of the community, and does not attempt to extend its disqualifying influence any further than office. But the legislature, prompted, no doubt, by an ardent and commendable desire to arrest the progress of what it conceived to be a great and growing evil, forgetting the restrictions imposed upon it by the constitution, has, in some of the subsequent sections, and again by the re-enactment of the same sections in eighteen hundred and twenty-six, far transcended the limits of its legitimate power, and overleaped some of the most important barriers erected by the constitution, to secure and protect the rights and liberties of the people. In the fourth and fifth sections of the act of eighteen hundred and nineteen, and the first and second sections of the act of eighteen hundred and twenty-six, is contained the oath which forms the subject of this enquiry, and which it is unnecessary to repeat here, as that, together with the consequences of a failure or refusal to take it, are recited above. This extraordinary oath, the extent to which it is required, and the consequences of a refusal to take it, constitute the great, and, in truth, the only objectionable features of

In the matter of J. L. Dorsey.

the whole law taken together. It is a manifest and to-
tal departure from the provisions of the previous sections
of the law, which, as was above remarked, were
strictly in accordance with the powers delegated to the
legislature by the framers of the constitution. It dis-
penses entirely with the necessity of a conviction for the
offence, *and effects a complete and total disqualification,
though no conviction has ever been had.* It enlarges, too,
the sphere of its operation, and draws within its influ-
ence, not only those holding offices and appointments of
profit, honor or trust, but also ATTORNEYS AND COUNSEL-
LORS AT LAW, which profession, as was remarked above,
was not included within the previous sections of the act,
unless under the general expression of " office or appoint-
ment of honor or trust." It is in reality a TEST OATH,
with not only all the objectionable features, that during
the reign of ignorance and superstition, characterised
those despicable instruments of despotic power, but also
with such new ones as the superior intelligence and in-
tegrity of modern times, have been able to engraft upon
them. It may not be amiss to recur, for a moment, to
the history and qualities of these relics of refined despo-
tism and tyranny, and to compare their features with
some that distinguish our own. Test oaths have always
been regarded, in well regulated governments, whether
republican or monarchical, as 'an odious innovation upon,
and usurpation of, the rights of the citizen or subject.
They are directly at variance with that long settled and
well established principle, which, as was above remark-
ed, constitutes an important element in the criminal
codes of all nations in which the controlling influence of

In the matter of J. L. Dorsey.

law, and not power and might is admitted, that every man is presumed to be innocent, until the contrary is shown. These odious and tyrannical requisitions, throwing aside the reasons that dictated, and stifling the humane feelings that sanctioned and approved this groundwork, as well as corner stone of criminal law, have attempted to establish the directly contrary doctrine, that the law presumes every man to be *guilty*, until he himself proves the reverse, by purging himself, through the medium of a *test oath*.

An important point in the character of the English tests, is one that is peculiarly applicable to the subject under consideration. Upon reference to the English statute books, it will be seen, that in every instance, the party taking the oath, was required to abjure some particular *tenet, opinion or doctrine*, either political or religious—to swear that he would support some other *tenet, opinion or doctrine*, the opposites to those abjured, or that he would support and maintain some particular church or form of worship, or true allegiance bear to some particular form of government, or reigning family. Not an instance can be found, in the whole history of these tests, where any other oath, or one nearly similar was ever required. It will be observed in this, that the object of these oaths was either to test the PRESENT *abstract opinions* of the individual, upon some particular subject, political or religious, or to require his FUTURE countenance and support to some particular political or religious institution. The only *times* taken into consideration, were the *present* and the *future*. The past was never looked into—and I think it probable, that in all the re-

finements of their political and religious tyranny, it was never once supposed by them that they had the legal power to go back and apply these tests to the *previous* opinions of an individual. No matter what heresies in political opinion or religious doctrine he may have *formerly* entertained or cherished, he was never required to declare them on oath, or to admit them by refusing to take the oath. These were regarded as beyond their reach—and if prohibited by law, as falling under the cognizance of the appropriate courts.

This brings me to another and the last point in the consideration of these tests. In addition to the foregoing distinguishing traits, their operation was always on the *conscience*, by the application of the test to *the opinions* of the individual; at least so far as that class of tests operating *in presenti* was concerned. They were never made, or intended to bear on the *acts* of the subject. The deeds of the individual were past and gone, and like the previous *opinions* of the party, if punishable by law, properly became the subject of judicial investigation. With the jurisdiction of the courts, these tests never interfered; and however unwise their requisition, or oppressive their operation in general, so far as the *acts* of the individual were concerned, they never sought to punish him without a trial, or attempted to pronounce him guilty without a conviction.

And again. The act of which the individual is presumed to be guilty, and of which he is required to purge himself, is not one, as in the case of English tests, which affects the safety of the government, but in its character and operation, is strictly private, affecting only individu-

7 P.                    44

als, and cannot, by the most strained construction, be made to operate to the injury or prejudice of the body politic of the State.

But, in addition to these fatal objections to the constitutionality of the Alabama test, there is still another, by no means the least important in the decision of this question. The effect of the first branch of the oath is to make the individual *testify against himself*. I do not contend that he is required to *declare* positively, that *he has been* guilty of the particular offence; but the effect is precisely the same, where he is required to say that *he has not*. In the darker periods of European history, and perhaps even now, in some of the more despotic governments of that continent, the rack has been · used as a means of procuring testimony, by torturing the accused into a confession of his guilt. But such means have never been sanctioned by a more enlightened age, or adopted by a government where the people are free. Here, however, the object is accomplished by means not so cruel or inhuman, but in other respects not wholly dissimilar. *Here, the confession is extracted by the very refusal to answer,*—There, the refusal was only taken as the ground of suspicion, when the rack was applied to confirm it. Here, on the contrary, the refusal is taken as the *evidence, and not the mere suspicion*, of guilt. As proof of it, for this alone, one of the severest punishments known to the law, is inflicted, by an exclusion from every office in the State, as well as the exercise or enjoyment of an important privilege. These exclusions were only intended by the constitution to operate upon the *commission* of the offence to be suppressed. The law presumes *that it has*

In the matter of J. L. Dorsey.

*not been committed* until it is proved—and the proof is extracted, and the penalty applied, *upon a refusal to take the oath.* It is thus that some of the most important rights of the citizen are wrested from him, not "by due course of law," but by trampling upon some of the clearest principles of law, and the plainest dictates of justice. But the injustice, as well as the absurdity and unconstitutionality of the law, as at present applied, is still more manifest by reference to another point, especially when considered in connection with the foregoing principles. It will be observed, that the power is left discretionary with the legislature, as was remarked above, to enact or not, such laws as it should deem expedient " to suppress the evil practice of duelling." The legislature had the power to create the offence, and to punish those guilty of a commission of it in the manner pointed out above. I have already shown, that although at one time (eighteen hundred and four,) it was deemed expedient to make the mere giving, accepting, or carrying a challenge, knowing it to be such, or aiding or abetting in either of these acts, an offence, yet the legislature, in eighteen hundred and nineteen, and immediately after the adoption of the constitution, thought otherwise, and consequently, made the offence to consist only in the actual fighting a duel, or the giving, accepting, &c. where the duel was actually fought. It may be necessary, however, to examine this point a little more fully than I have hitherto done. The language of the oath, as found in the act, and quoted above, is: "I, ———, do solemnly swear, that I have neither directly nor indirectly given, accepted, or knowingly carried a challenge,

in writing or otherwise, to, &c.— or aided or abetted in the same, since the first day of January, eighteen hundred and twenty-six," &c.   The act which is here denied, is that the affiant has not, within the time mentioned, given, accepted, or knowingly carried a challenge, or aided or abetted in the same.   There is no allusion made to any actual fight, which may have resulted from such challenge.   Not the most remote intimation given of any previous criminal prosecution, trial or conviction ; but it is confined solely to the giving, accepting, &c. as if the action of the parties had ended at that point.   Is this, then, an offence within the meaning and intention of any of the criminal laws of Alabama ?   Is it a crime for which an adequate punishment has been prescribed ? Or is it a mere misdemeanor, falling under the head of *mala prohibita,* for which a mere fine is imposed ?   Were it even necessary to resort to adjudged cases, to settle this point, these questions could be easily answered by the decision of our own Supreme court, in the case of Smith vs the State, (1 Stewart's R. 506.)   It was admitted above, that by the statute of eighteen hundred and four, these several acts were made offences, and punished by a fine of one thousand dollars, and imprisonment for twelve months, &c. but the offences themselves were abolished, and the penalties consequently repealed by the act of eighteen hundred and nineteen—and the only offences connected with the duelling act, (when no death ensues,) that are now punishable in this State, are the actual fighting of a duel, or the giving, accepting, &c. when a duel is really fought.   This being true, neither a fine or imprisonment can be inflicted, *even on convic-*

In the matter of J. L. Dorsey.

*tion*, except in such cases. This was the very point decided in the case of Smith vs the State. For the same reason, neither can the other, and by far the severer penalty, of *disqualification for office, be inflicted by a similar conviction.*

But it may be contended, that although neither of these acts is expressly declared by the act of eighteen hundred and nineteen, to be an offence, and punishable, yet, that the mere requisition of the oath, does, of itself, constitute the offence, and prescribe the punishment.— This, I conceive, is the only ground that can be taken ; for it will not be contended, that the legislature intended to inflict any punishment, however light, upon an individual *guiltless of any crime.* This ground, however, is equally untenable as all the others that I have noticed. As a penal law it must be strictly construed, and unless the offence is clearly marked out and defined, and the punishment prescribed, it cannot be legally enforced. But such is not the case with this law. There is no act prohibited --no offence defined—and no penalty prescribed. If such things *are* contained in the law, they are produced only *by implication,* in opposition to the well settled principle of law to the contrary, that an offence can be created, or a penalty imposed ONLY BY EXPRESS WORDS, *and can never arise by implication* – (See Jones vs Estes—2 Johns. Rep. 379 ) But had this question been at all doubtful, it would have been fully settled, in the case of Smith vs The State, referred to above. It will be seen that the decision was made in that case, in eighteen hundred and twenty-eight, two years after the re-enactment of the oath required in the act of eigh-

In the matter of J. L. Dorsey.

teen hundred and nineteen.   If these several acts of giving, accepting, &c. had really been made offences, *by the mere requisition of the oath*, they would have been so declared by the Court.   But it has been shown, that the Supreme Court decided otherwise.

The only object then, that the Legislature could have had in requiring the oath to be taken, *was not to create the offence*, and prescribe *disqualification* as the penalty, but it was to carry out the previous sections of the act, and to require that the individual himself should furnish the evidence of some act by which he had been *previously* disqualified.   The previous sections of the law had declared in what the offence should consist, and the mode of applying the punishment—as well of disqualification, as of fine and imprisonment.   The test was only intended to be used as a means, by which it could be ascertained that the individual *had been* disqualified, according to the provisions of the previous sections of the act.   The existence of even this power, I think, I have already shown to be clearly unconstitutional—*as it requires the accused to testify against himself.*   But, admitting for a moment, that it is clearly within the scope of legislative power, it establishes only this point, that when the individual *has really been disqualified*, he may be called upon to admit it by a refusal to take the oath. But then the question recurs, what amounts to, or produces a disqualification ?   The answer is prompt, and the reason of it clear—a *legal conviction* of having fought a duel, or *of giving, accepting, &c. when a duel has been fought.*   Here, the disqualification had *previously* taken effect *by the conviction*, and all that the individual would

In the matter of J. L. Dorsey.

be required to do, would be to admit, by the refusal to swear, that such had been the case. But even this, I regard, for the reasons urged, as an unconstitutional stretch of power. Could the requisition be made in this case, when a disqualification had been effected, the same reason would sustain it in every other. Were it constitutional, in a case where it had been produced by a conviction, for fighting a duel, or giving, accepting, &c. it would be equally so, where a conviction had been had for *bribery, perjury, and forgery.* No one, I presume, would pronounce a law of this character, constitutional. It would be absurd to rely upon the oath of an individual convicted of either of these crimes—and more especially of *perjury,* for the evidence of his disqualification. But, in addition to this, the requisition would be so utterly contrary to every principle of law, that an advocate for it could never be found : and yet, in truth, there is no essential difference in the two cases. In both, the disqualification is produced, *not by the commission of the offence, but by a conviction for it;* and in each, the individual would be required to admit *only the conviction.* No more power has been conferred upon the legislature, in disqualifying for the offence of dueling, than for bribery, perjury, and forgery. In truth, it has been shewn, that the power is more limited. The word " expedient,' used in the section from which the power is derived, cannot, by the most enlarged and liberal construction, be made to confer upon the legislature the power to pass *any* law that might be suggested, without regard to the other provisions of the constitution. It was only intended to confer the discretionary power, *to pass or not,*

as might be deemed expedient, a penal law to suppress
the evil practice of dueling. Any other construction,
would give to the legislature a power wholly unlimited,
in opposition to the whole spirit of the instrument. If
the foregoing views and considerations are correct, they
establish this point—that the first branch of the oath is
repugnant to the constitution and laws of Alabama, and
is consequently void. The oath is entire, and being void
in part, is void *in toto*, and cannot be required of any ci-
tizen, whether an applicant for office, or otherwise.

I have already shown that the legislature is restricted
in the requisition of *qualifications for offices, stations, pri-
vileges, and franchises.* to those things that constitute or
imply a *fitness* by natural endowment or acquirement,
for the proper and faithful discharge of the duties per-
taining to such office, station, or appointment, or for the
exercise and enjoyment of such privilege or franchise.—
Now, it will not be contended. I presume, that the mere
exemption from having given, accepted, or carried a
challenge, or aided or abetted in either of those acts, ren-
ders an individual better fitted or *qualified* for the pro-
per and faithful discharge of the duties of any office,
station, &c. than one who is not so exempt, all other
things being equal. This is more especially true in re-
lation to the profession of the law. The most rigid mo-
ralist would never assert that a lawyer's talents were at
all depreciated, or his legal learning abridged, by either
of these acts. Neither can it be said that either or all
of these acts together, can be urged as an evidence of a
want of good moral character, which I admit to be a
necessary *qualification* for an attorney or counsellor at

In the matter of J. L. Dorsey.

law : for there is no principle of law better settled, than that either good or bad character can only be proved by *general reputation*, and not by any single act or number of acts. As then, the commission of either of these acts does not constitute or imply a want of fitness, for the proper and faithful discharge of the duties of any office, station, &c. it is perfectly clear that the requisition o the oath was not, and could not have been intended as a *qualification* for office, &c. but that on the contrary, *it was designed by the legislature to operate as a disqualification, and in that sense alone is to be regarded.*

Now, upon reference to the principles that I shall regard as ascertained in the foregoing comments, it will be seen, that no citizen can be legally disqualified for any office, station, or appointment, or the exercise and enjoyment of any right, privilege or franchise, which any other citizen can hold, exercise or enjoy, unless he has been *guilty* of some CRIME or MISDEMEANOR ; and not even then, until he has been LEGALLY CONVICTED. Now it is perfectly apparent, and I presume will not be denied, that the requisition of this oath *can*, and *does* operate, in many instances, as *a complete and total disqualification* for, and *exclusion* from offices, stations and appointments, but also, from certain rights, privileges, and franchises. It has also been shewn, that this disqualification is pro luced, not only without the individual having been *legally convicted* of any *crime* or *misdemeanor*, but also without having been *guilty of any act, which is, in Alabama, an offence, either by the statute or common law.* The requisition of the oath, therefore, is clearly unconstitutional, and the act itself, consequently, null and void.

7 P.        45

It has also been shown, that the *disqualifying power* of the legislature extends *only to office. suffrage, and serving on juries*, and the question would here arise, does the word "office," in section third. article six, of the constitution, embrace or include the profession of law?— But the view I have taken of the subject, renders it unnecessary for me to discuss this question. But were it even necessary to make this point, I should be compelled to regard it as completely settled, by the decision of the Court of Appeals of Virginia, in Leigh's case—(1 Mumf. Rep. 468,)—and I have no doubt the court will take the same ground. In discussing it, I could only repeat the lucid arguments of Mr. Leigh, and of Justices Roane and Fleming, on that occasion—I should despair of ever being able to add to their force.

This point being settled, renders the position I have assumed so much the more impregnable; for if the disqualifying power of the legislature *can only extend to office, suffrage, and serving on juries, for any offence, or for a combination of every crime*, it is perfectly clear that a law which operates as a *disqualification* of an individual *for the practice of the law, which is not included in either of those terms, and who has been guilty of no offence*, is certainly unconstitutional, and therefore, null and void.

GOLDTHWAITE, J.—I have given to this subject the consideration demanded by its importance as a constitutional question, and am convinced, that one part of the oath imposed by the act of Assembly, usually called the duelling act, is inhibited by the constitution. As the oath is not divisible, and is in part unwarranted by the

In the matter of J. L. Dorsey.

fundamental law, in my opinion, we ought not to re-
quire it to be administered.

The act was passed on the seventh day of January,
eighteen hundred and twenty-six, and requires all mem-
bers of the General Assembly, all officers and public
functionaries, elected or appointed under the constitution
or laws of the State, and all counsellors and attorneys at
law, before they enter on the discharge of the duties of
their stations or offices, to take and subscribe the follow-
ing oath : "I do solemnly swear that I have neither di-
rectly nor indirectly given, accepted, or knowingly car-
ried a challenge, in writing or otherwise, to any person
or persons, (being a citizen of this State,) to fight in sin-
gle combat or otherwise, with any deadly weapon, ei-
ther in or out of this State, or aided or abetted in the
same, since the first day of January, one thousand eight
hundred and twenty-six; and that I will neither direct-
ly nor indirectly, give accept, or knowingly carry a
challenge in any manner whatsoever, ·to any person or
persons, (being a citizen of this State,) to fight in single
combat or otherwise, with any deadly weapon, either
in or out of this State, or in any manner aid or abet the
same, during the time for which I am elected, or during
the time of my continuance in office, or during the time
of my continuance in the discharge of any public func-
tion." In another section, this oath is modified with re-
spect to persons who may remove into the State, or
become citizens after the enactment, and requires such
to swear that they have not committed the acts speci-
fied since their removal into the State, or since they be-
came citizens. If any member of the General Assembly,

In the matter of  J. L. Dorsey.

officer, or public functionary, shall refuse to take the
oath, the act of assembly provides that his seat, office or
function, shall be vacated, and filled in the same manner
as if he had resigned ; and no counsellor or attorney,
who shall fail or refuse to take the oath, shall be per-
mitted to practice in any court of the State.

This, oath, if taken, has evidently a two-fold opera-
tion—retrospective to the first day of January, eighteen
hundred and twenty-six—prospective, as to all future
time during which the individual taking it shall contin-
ue to discharge any public function.   The *object* of the
prospective part of the oath, is to impose on the individu-
al, a solemn obligation to refrain from the commission of
the acts specified, so long as he continues in any public
station.   It would seem to be the object of the retrospec-
tive portion of the oath, to exclude from office all who
had committed any of the offences named, but as this is
not evident, it will be proper to examine all the aspects
in which it can be presented.   It may have been inten-
ded by the general assembly to insist on the oath, as a
*qualification* for office or station.   If intended to exclude
from office, or to  *disqualify*, in consequence of the com-
mission of any of the acts named, then, it is clear that a
mean is provided by which this disqualification is en-
forced.

Whichever of these intentions operated on the general
assembly to pass this act, is immaterial, as both lead to
the same legal consequences.

Qualification and disqualification, are not unfrequent-
ly used in common parlance, as convertable terms; or ra-
ther disqualification is oftentimes used to express the

In the matt r of J. L. Dorsey.

absence of qualification : thus, it is sometimes said that a person is disqualified as an elector, because he is not a citizen ; or that a juror i , disqualified by not being a freeholder or householder. I consider it essential, to ascertain with some degree of precision, what meaning ought to be attached to these terms, and as the constitution, in many cases, requires or prescribes qualifications, and in other's permits of disqualifications, it will afford an excellent guide to arrive at the true sense in which these terms are to be understood. The fifth section, article three, prescribes the qualifications for an elector : he is to be a white male person, twenty-one years of age or upwards – a citizen of the United States, and shall have resided in t e State one year, and in the county or town in which he votes, three months, &c.

Section four, article three, prescribes the qualifications of a representative. He is to be a white man, a citizen of the United States, an inhabitant of the State for, two years next preceding his election, and the last year thereof, a resident of the county, &c. for which he shall be chosen, and shall be twenty-one years old.

Section twelve, article three, prescribes the additional qualification for the office of Senator, that the individual chosen shall be twenty-seven years of age.

The Governor must be at least thirty years of age— Section four, article four.

Disqualifications are declared to arise under the following circumstances : "No person shall hold the office of governor, or any other office or commission, civil or military, either in this State, or under any State, or the

United States, or any other power, at one and the same time—Section twenty-two, article four.

A sheriff shall not be eligible to serve either as principal or deputy, for the three years succeeding his term of office—Section twenty-four, article four.

No person, who shall have attained the age of seventy years, shall be appointed to, or continue in the office of judge—Section fourteen, article five.

The general assembly is invested with the discretionary power to pass penal laws to suppress the evil practice of duelling, extending to disqualification from office, and is required to pass laws to exclude from office, from suffrage, and from serving as jurors, persons convicted of bribery, forgery, perjury, or other high crimes and misdemeanors—Sections three, four and five, of article six.

These extracts from the constitution, show nearly all the cases in which qualification is prescribed, or disqualification permitted or enjoined, and from them I deduce these definitions :

1st. Qualification is some state or condition *possessed or attainable by each citizen of the State;*

2d. Disqualification is *the taking away of the state or condition previously possessed, or the rendering it impossible to acquire the same,* and can only arise *from the commission of some offence* by which qualification is destroyed, or by the *attainment of some other state or condition* incompatible with it. It is obvious, if no fixed and definite meaning is to be attached to these terms, that language may be employed to prescribe *qualifications* which would produce numerous classes of *disqualifications:* but if the definitions given be correct, then it becomes easy

In the matter of J. L. Dorsey.

to determine, independent of the expressions used, whether the state or condition is one of qualification, or its reverse. If every citizen of the State can possess or attain it, it is clearly a qualification; but if it is impossible to any, an actual disqualification immediately attaches, to such as can by no possibility comply with the requisitions. The retrospective part of this oath, as it can only be taken by one who is innocent, effectually disqualifies all those who are guilty, and as this state of innocence cannot be regained by them, it is equivalent to a perpetual exclusion from office.

The prospective part of this oath requires a condition which all can comply with, and is therefore strictly a qualification, within the sense of the term as ascertained from the constitution.

Before proceeding to an examination of the constitution, to determine if such a qualification can be lawfully required, or such a disqualification created, and enforced in the manner contemplated by this act, it is not improper to declare, that I consider the declaration of rights, as the governing and controlling part of the constitution; and with reference to this, are all its general provisions to be expounded, and their operation extended or restrained. The declaration itself, is nothing more than an enumeration of certain rights, which are expressly retained and excepted out of the powers granted; but as it was impossible, in the nature of things, to provide for every case of exception,—a general declaration was added, that the particular enumeration should not be construed to disparage or deny others retained by the people. What those other rights are, which are thus reser-

ved, may be readily ascertained by a recurrence to the preamble to the declaration of rights.   The object to be attained by the people, when assembled in convention, was not the formation of a mere government, because such might, and in many cases would be, arbitrary and tyrannical, although democratic in its form :—It was to form a government with *clearly defined and limited* powers, in order that " the general, great and essential principles of liberty and free government might be recognised and established."   The general assembly is not expressly prohibited from enacting laws requiring political test oaths to be taken, nor from excluding some of its citizens from the pursuit of certain trades or avocations, yet no one would contend that any such laws could be operative, because it is evident that they are adverse to the principles of liberty and free government. With these general views of the instrument, I yield my entire concurrence to the position laid down by the Chief Justice in the case of the State vs McDonald, ( 1 Por. 465,) that our legislature looks not to the constitution for a grant of powers, but exercises all such as are compatible with the social compact, unless restrained by express inhibition or clear implication.

The first section of the declaration of rights, announces the great principle which is the distinctive feature of our government, and which makes it to differ from all others of ancient or modern times : "All freemen, when they form a social compact, are equal in rights, and no man, or set of men, are entitled to exclusive separate public emoluments or privileges, but in consideration of public services."   This is no empty parade of words : it

In the matter of J. L. Dorsey.

means, and was intended to guarantee to each citizen, all the rights or privileges which any other citizen can enjoy or possess. Thus, every one has the same right to aspire to office, or to pursue any avocation of business or pleasure, which any other can. As this general equality is thus expressly asserted and guaranteed as one of the fundamental rights of each citizen, it would seem to be clear, that the power to destroy this equality must be expressly given, or arise by clear implication, or it can have no legal existence. Such, indeed, we find to be the case, in the instances which have been quoted from the constitution. Wherever no qualification is prescribed as a condition for office or station, the door is open to every citizen ; and wherever power is given to exclude, it specifies, with much precision, the cases in which it may be exercised. This view of the case, does not detract from the legislative power, to prescribe qualifications to be possessed, before any avocation or business can be pursued, so long as the qualifications can be attained by all. If otherwise, if any citizen is disqualified from the pursuit of any avocation or business, which any other citizen can pursue, an immediate and direct inequality is produced, which, to be legal, must, in my opinion, find its warrant in some express grant of power. It will be conceded, that in all the cases where qualifications are prescribed by the constitution, none other can be imposed by law : thus, an elector, otherwise qualified, cannot be required to possess a freehold or other estate. As the constitution is silent with respect to the pursuits of business or pleasure, the general assembly has the power to prescribe any qualifications, not inconsistent with the

7 P.                        16

In the matter of J. L. Dorsey.

rule, that equality of right must be preserved : in other words, that any citizen may lawfully do what is permitted to any other. It rests with the legislative power, to prescribe the conditions on which any avocation or calling shall be pursued, so that the door is closed to none; and there seems to be no other limit to their discretion, than the one which arises from the first section of the declaration of rights, before adverted to. The constitution, in its general provisions, attempts to define the powers of those entrusted with the management of the affairs of the body politic, and is emphatically a collection of rules for the officers of the State : It is alone in the declaration of rights, that the people at large are guarded and protected; and we look in vain to any other source, to ascertain the rights secured to the citizen.

The general equality of all citizens having been declared, and in effect, guaranteed, it becomes necessary to enquire, if the constitution has left it to conjecture, in what cases this equality can be destroyed. If the instrument was entirely silent, I should doubt whether any power existed, after the express guarantee before spoken of, to legislate on this subject; but when I find cases enumerated, in which this equality is taken away, or authorised to be destroyed, I am bound to conclude, that the power must be exercised alone in the manner prescribed or permitted. If it is admitted that the general assembly, without an express grant of power, can disqualify a citizen from pursuing the avocation of a planter or a merchant, a physician or a teacher, a mechanic or a lawyer—and cannot disqualify him for holding or aspiring to office, except in the cases permitted

or prescribed, then our government presents the singular anomaly of having been instituted for the protection and preservation of the rights of the people, yet guarding effectually nothing but the right to hold or aspire to office. In my opinion, this admission cannot be made, and we must look to the constitution for an affirmative grant of power to disqualify, which, if not there found, cannot be said to exist.

The clauses of the constitution which permit or prescribe cases of disqualification, are the following: "The general assembly shall have power to pass such penal laws to suppress the evil practice of duelling, *extending to disqualification from office, or the tenure thereof*, as they may deem expedient"—Section three, article six.

"Every person shall be disqualified from holding any office, or place of honor or profit, under the authority of the State, who shall be convicted of having given or offered any bribe to procure his election or appointment" —Section four, article six.

"Laws shall be made to exclude from office, from suffrage, and from serving as jurors, those who shall hereafter be convicted of bribery, perjury, forgery, or other high crimes or misdemeanors"—Section five, article six.

The intention of the convention in inserting the third section, and its meaning, are easily ascertained by the ordinary rules of construction. The first section of the sixth article prescribes *an oath of office*, which is required to be taken by all members of the general assembly, and all officers, executive and judicial. Standing alone, this might impliedly restrict the legislative power from imposing any additional obligation; but the subsequent in-

troduction of the third section, seems to me to annul this implied restriction, and invests the general assembly with authority, by law, to impose an additional oath, if, in their discretion, they deem it a proper means to suppress the evil practice of duelling. Both sections contain affirmative provisions, and must be so construed as to give the fullest effect to each, not inconsistent with the other. If the third section was omitted, the fourth and fifth sections would have ascertained the only offences, of which the conviction for, would disqualify from office; and as duelling is not among the enumerated offences, and as it might be questioned whether the *mere* sending or accepting a challenge to fight a duel, could be included within the designation of 'other high crimes and misdemeanors,' it was essential to confer the power to exclude from office, for this and similar causes, by an express provision. Again, the general assembly is *required* to pass the laws specified in the fifth section, but its action under the third, is left entirely discretionary ; hence arises the necessity for the introduction in the latter, of the words italicised—not as a limitation of power—but to remove all question, and declare that the authority to pass laws, to extend to disqualification from office, or the tenure thereof, shall exist, notwithstanding what is declared in the subsequent sections.

These sections, providing for the disqualification of citizens, necessarily control the general equality of right, which is declared to exist by the first section of the declaration of rights; and the legislature is expressly authorised to enact laws to prescribe and enforce the disqualifications permitted. It may become important to

In the matter of J. L. Dorsey.

consider to what state or condition of the citizen a qualification can be annexed. The terms '.office, or the tenure thereof,' are used in the third section; ' office, or place of honor or profit, under the authority of the State,' in the fourth; and ' office,' generally, in the fifth. It is supposed these are not sufficiently comprehensive, to include an attorney or counsellor at law, who are said to exercise a function or duty. In my opinion, this inquiry is wholly immaterial to the determination of the present question, as the conclusion to which I have arrived, will apply as well to the case of an officer, strictly so called, as to any other individual. If a *statute* excluded from *office*, one convicted of a particular offence, and used no other term of designation, I should not hesitate to decide, that the profession of a lawyer was not included within the meaning of the term, as generally used; because, he can no more be said to hold an office, than one who pursues the profession of a physician, the avocation of a teacher, or who discharges the functions of an administrator or guardian. But if I were called on to declare, that the constitution, by these express grants, has not invested the general assembly with power to exclude from the exercise of these or similar professions, I confess I should very much doubt the propriety of such a construction. The present inclination of my judgment is, that those terms are sufficiently comprehensive to include all avocations, franchises, professions or functions, which are public in their nature, and which, therefore, may affect the constitution and well being of society.

I have arrived at the conclusion, (satisfactory to myself, at least,) that the authority to pass disqualifying

In the matter of J. L. Dorsey.

laws, whether affecting the citizen as an individual, or as an officer, is derived from the sections of the constitution quoted, and exists in no other cases. I have endeavored to show, that the general assembly is thereby invested with plenary power over the whole subject matter of duelling, extending to disqualification from office, or from the exercise of any avocation, profession, franchise or function, of a public nature, and that *any oath may be required as a qualification for office, imposing on the conscience any obligation to do or omit any act which can be performed or omitted by every citizen, in relation to any matter connected with the suppression of the practice of duelling.* I have also endeavored to show, that the retrospective part of the duelling oath, requiring a state of innocence which is not possessed by all, imposes a disqualification on the guilty. It remains only to consider if this disqualification can be enforced on any individual, guilty of the offence of duelling, in the manner contemplated by this act.

I have omitted any argument, to show, that disqualification from office, or from the pursuit of a lawful avocation, is a punishment: that it is so, is too evident to require any illustration; indeed, it may be questioned, whether any ingenuity could devise any penalty which would operate more forcibly on society.

Let us now examine this act, with a view to determine whether a mode is provided by which guilt can be ascertained, and is punished. A citizen is informed, that by the laws of the State, he is entitled to aspire to any office, or pursue any avocation which any other citizen can; yet when he is about to enter on the office or

avocation, he is required to swear to his innocence of a particular crime: it then becomes evident, if he cannot truly take the oath required, that he is excluded. Can it be doubted, that for all the purposes of disqualification, the guilt of the individual is ascertained? In what does it differ from a general enactment, declaring that a candidate for office shall be required to prove and establish his innocence of the specified crime?

Admitting an individual to be guilty, he is neither *accused, tried or convicted,* by any tribunal known to the laws, yet he is punished with unerring certainty and the utmost celerity: his conscience is made his sole accuser and judge: his punishment commences with the commission of the crime, and terminates only when he ceases to exist: he is excluded from the sympathy of his peers—no legal doubt can intervene, to produce his acquittal—an error of his judgment involves his soul in the awful guilt of perjury, or punishes him without guilt. I have no hesitation in declaring, that this act provides a mode of ascertaining and punishing guilt, which is not only unwarranted by the constitution, but is also in direct contravention of several of the most important provisions of the declaration of rights, by which the liberties and privileges of the citizen are guarded. The twenty-eighth section provides, that "the right of trial by jury, shall be preserved inviolate." This was doubtless intended to guarantee the trial by jury, as it existed when the constitution was formed, and to prevent the assumption of any power by which this institution could be impaired. The tenth section had previously guaranteed, that "in all criminal prosecutions, the accused has

a right to be heard by himself and counsel; to demand the nature and cause of his accusation, and have a copy thereof; to be confronted by the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and in all prosecutions by indictment or information, a speedy public trial, by an impartial jury of the county or district in which the offence shall have been committed; he shall not be compelled to give evidence against himself, nor shall he be deprived of his life, liberty or property, but by due course of law." These restrictions must mean, if they are not idle declamation, that no one shall be subjected to any other mode of trial for criminal offences, than was recognised by the common law; and so careful were the framers of the constitution to guard the citizen from all encroachment, that in another section, they declare that no person shall, for any indictable offence, be proceeded against criminally, by information, except in cases arising in the land and naval forces, or the militia, when in actual service, or by leave of the court, for oppression or misdemeanor in office—Section twelve.

When once it is admitted or proved, that a citizen has the right to aspire to office, or to pursue any lawful avocation, it seems to me impossible that he can be legally deprived of this right, as a punishment for an offence committed, without a trial by jury; and I can perceive no sound distinction between a law which deprives one of his right without a trial, and that which ascertains and punishes his guilt by an illegal mode of trial.

There is another view in which this act may be considered. The governor is invested with authority, by

In the matter of J. L. Dorsey.

the eleventh section of the fourth article, to grant re-prieves and pardons in all criminal and penal cases, except in those of treason or impeachment. We cannot presume that the general assembly intended by this act, to interfere with the constitutional prerogative of mercy vested in the executive, yet this act, if constitutional, imposes a penalty which cannot be remitted, and inflicts a punishment beyond the reach of executive clemency.

We are not at liberty to disjoin the several parts of this oath, and require such part only to be administered as we consider to be legal, because such an oath would not be the one prescribed.

A majority of the court is of opinion, and so decide, that the oath, being in part illegal, ought not to be imposed; and therefore, the gentleman who has been examined, will receive license to practice, on taking the other oaths required by law.

ORMOND, J.—The grave and important question raised in this case, is, whether the applicant has the right to practice as an attorney and counsellor at law in this State, without taking the oath prescribed by the law against duelling, passed in the year eighteen hundred and twenty-six. That law provides that " all members of the general assembly, hereafter to be elected, and all officers and public functionaries, hereafter elected or appointed under the authority of the constitution and laws of this State; and attorneys and counsellors at law, shall, before they enter on the discharge of the duties of their stations or offices, either civil, military, or otherwise, take and subscribe one of the following oaths, (as the

7 P. 47

In the matter of J. L. Dorsey.

case may be,) in addition to the oath prescribed by the constitution, before any judge, &c.: 'I —— ——, do solemnly swear, (or affirm, as the case may be,) that I have, neither directly nor indirectly given, accepted, or knowingly carried a challenge, in writing or otherwise, to any person or persons, (being a citizen of this State,) to fight in single combat or otherwise, with any deadly weapon, either in or out of this State, or aided or abetted in the same, since the first day of January, one thousand eight hundred and twenty-six; and that I will neither directly nor indirectly, give, accept, or knowingly carry a challenge in any manner whatsoever, to any person or persons, (being a citizen of this State,) to fight in single combat or otherwise, with any deadly weapon, in or out of the State, or in any manner whatsoever aid or abet the same, during the time for which I am elected, or during the time of my continuance in office, or during my continuance in the discharge of any public function.' And upon his or their refusing to take the oath aforesaid, his or their seat, (if a member of the general assembly,) or his or their office, or public function or appointment, shall be vacated, and shall be filled in the same manner as if he or they had resigned. Any attorney or counsellor at law, failing or refusing to take the said oath, shall not be permitted to practice as such, in any court in this State."

The succeeding section of the law varies the oath, as to such persons who have become citizens of the State since the first of January, eighteen hundred and twenty-six, requiring them to swear, that "I have not given, accepted, &c., since I have been a citizen thereof," &c.

In the matter of J. L. Dorsey.

The clause of the constitution supposed to be relied on to sustain this law, is the third section of the sixth article, and is in these words: "The general assembly shall have power to pass such penal laws, to suppress the evil practice of duelling, extending to disqualification from office, or the tenure thereof, as they may deem expedient."

The first question which naturally presents itself, is, whether the privilege or right to practice law, is an *office* within the meaning of the third section of the sixth article, just cited.

The word office has two meanings—the one popular, the other legal and technical. Thus, we speak of the office of an executor, guardian, &c. The legal meaning of the term always implies "a charge, or trust, conferred by public authority, and for a public purpose." It is most unlikely, that in framing a constitution of government, its authors should have used a word of the importance of this, technical in its nature, and by consequence having a fixed legal signification, in a loose or popular sense. The presumption must be, that it was used in its legal and technical sense, unless the context show the contrary. The language of the clause in question, "extending to disqualification from office, or the *tenure* thereof," is quite conclusive of its meaning; for with no propriety of language could the *tenure* of an office be spoken of, unless it were an office of public trust.

The fourth clause, which immediately succeeds the one just discussed, is in these words: "Every person shall be disqualified from holding any office or place of honor or profit, under the authority of the State, who

In the matter of J. L. Dorsey.

shall be convicted of having given or offered any bribe, to procure his election or appointment."

The fifth reads thus : " Laws shall be made to exclude from office, from suffrage, and from serving as jurors, those who shall hereafter be convicted of bribery, perjury, forgery, or other high crimes and misdemeanors."

Here we find, in the fourth section, the word office defined to be " a place of honor or profit, under the authority of the State ;" and in the fifth section, where the same offence mentioned in the fourth section, (bribery,) is again provided for, the disqualification is from "*office*" simply, without adding the explanatory words found in the fourth section. No reason, it is believed, can be assigned for the use of this word in a different sense in the third section, from its clear and plain meaning in the fourth and fifth sections.

But again : under the head of impeachments, we find that the governor and all civil officers shall be liable to impeachment for any misdemeanor in office. The term is general—*all civil officers*—and must embrace all persons holding an office within the purview of any constitutional regulation or restriction ; yet no one, we apprehend, would contend, that for mal-practice, or for other good and sufficient cause, an attorney at law must be removed by impeachment before the Senate. Yet this would be the consequence of considering attorneys and counsellors at law, *officers* within the meaning of the constitution. It is therefore, I think, demonstrable, that by the term " *office*," in the third section of the sixth article, the privilege or right to practice as attorneys or counsellors at law, is not included ; but that the phrase is refer-

able only to those who exercise an office or place of honor or profit under the State government, and by authority derived from it.

As it appears clear, from the slight examination just made, that the word "office" was not intended by the framers of the constitution to extend to, or include the right to practice law as an attorney in this State, it is quite unimportant, for the purpose of this investigation, what rank in the scale of society may have been assigned to this class of persons elsewhere. The question, however, came before the Court of Appeals of the State of Virginia. in Mr. Leigh's cas?, (1 Munford, 468,) whether an attorney at law was an officer of the Commonwealth, and as such required to take the anti-duelling oath; and it was determined he was not. So, also, in the State of New York, it was determined by the Supreme court, that an attorney or counsellor at law did not hold an office or public trust in the sense of the constitution—(̲0 Johnson's R. 492.) In England, also, where attorneys and counsellors at law are vested with many important privileges unknown in this State, it has been held that they are not officers of the government, so as to be required to take the test or abjuration oaths.

I am therefore clearly of opinion, that if the law in question rests for support on the third section of the sixth article of the constitution, and on the ground that attorneys at law, are officers upon whom the disqualifying law authorised by that section, to be passed, was to operate, it is unconstitutional and void.

It is not, however, certain that the legislature, in the passage of the law in question, considered attorneys and

counsellors at law as officers of the State, upon whom, as such, the refusal to take the oath was to operate as a disqualification. This receives some countenance from the peculiar phraseology of the law. The persons required to take the oath swear that they will not offend against its provisions, *during the time for which they were elected,* or *during* their *continuance in office,* or whilst in the discharge of any *public function;* the act thus proceeds: "And upon his or their refusing to take the oath aforesaid, his or their seat, (if a member of the general assembly,) or his or their office, or public function, or appointment, shall be vacated, and shall be filled in the same manner as if he or they had resigned." It is too manifest to require illustration, that thus far, the requisitions of the act would not apply to attorneys and counsellors at law. The act then proceeds thus: "Any attorney or counsellor at law failing or refusing to take said oath, shall not be permitted to practice as such in any court of this State." It is, therefore, not only very clear, that no authority to require the oath against duelling, to be taken by attorneys and counsellors at law, can be derived from the grant of power in the third section of the sixth article of the constitution, to pass laws disqualifying from office, offenders against it, but it is also quite apparent from the law itself, that the legislature did not derive its authority from that source.

The great object of all free governments, has been to secure an equal administration of the laws. But the people of the United States have attempted the still more difficult task of binding even the legislative department of the government, by an organic law.

In England, when the principles of civil liberty were not as well understood, or as firmly established as they are at the present day, eminent men have at different times asserted that the parliament was not omnipotent, and fearlessly declared those principles of civil liberty, which have since then, in this country, been declared and placed beyond all doubt, by their assertion, as part of the organic law of the land.

Thus, we find Lord Chief Justice Hobart, asserting that " if a statute says that a man shall be a judge in his own cause, such a law, being contrary to natural equity, shall be void." And again, Lord Coke, in Bonham's case, declared that " where an act of parliament is against common right or reason, or repugnant, or impossible to be performed, the common law shall adjudge it to be void." Of this declaration, Lord Holt, in the case of the City of London and Wood, said " that the observation of Lord Coke was not extravagant, but was a very reasonable and true saying."

It is true, that in that country, these opinions were then, and have since been questioned, as applicable to the British constitution, though it is conceded by a recent English writer, that such is the law of the United States —(See Dwarris on statutes, 646.) Indeed, it cannot be necessary, at this day, to cite authorities to establish the principle, that a law contravening the constitution is void, and that the judiciary have power to declare it so.

" In the case of Calder vs Bull—(3 Dallas Rep. 386)— Judge Chase, impelled by the same strong sense of justice, and animated by the same principles of liberty, which influenced the British Judges, just quoted, takes

In the matter ot J. L. Dorsey.

the high ground, "That there are certain vital principles in our free republican government, which will determine and overrule an apparent and flagrant abuse of legislative power; as to authorize manifest injustice by positive law; or to take away that security for personal liberty, or private property, for the protection of which government was established. An act of the Legislature (for I cannot call it a law,) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority. The obligation of a law, in governments established on express compact, and on republican principles, must be determined by the nature of the power on which it is founded. A few instances will suffice to explain what I mean. A law that punishes a citizen for an innocent action, or in other words, for an act which when done, was in violation of no existing law; a law that destroys or impairs the lawful contracts of citizens; a law that makes a man a judge in his own cause; or a law that takes property from A and gives it to B. It is against all reason and justice, for a people to entrust a legislature with such powers, and therefore, it cannot be presumed that they have done it. The genius, the nature, and the spirit of our State governments, amount to a prohibition of such acts of legislation; and the general principles of law and reason forbid them. The Legislature may enjoin, permit, forbid and punish; they may declare new crimes and establish rules of conduct for all their citizens in future cases; they may command what is right, and prohibit what is wrong, but they cannot change innocence into guilt, or punish innocence as a crime; or

violate the right of an antecedent lawful private contract; or the right of private property. To maintain that our federal or State Legislatures possess such powers if they had not been expressly retained, would, in my opinion, be a political heresy, altogether inadmissible, in our free republican governments."

Judge Iredell, in the same case, held a different doctrine, maintaining that if a law was within the general scope of constitutional power, no court could pronounce it void, because it was, in the judgment of such court, contrary to the principles of natural justice.

It is not necessary to decide the abstract question, mooted by these eminent men—whether the very principles upon which our government is founded, do not forbid the passage of laws which are repugnant to natural justice and equity, or which violate the principles of civil liberty, because the people who formed the Constitution of Alabama, have provided by the organic law of the State, for the examination by the judiciary, of all laws having this tendency, whether expressly forbidden by the bill of rights or not.

The people, by that instrument, have enumerated and asserted certain first principles, which they therein declare, they have reserved to themselves, and have not delegated to the legislative department of the government. The last section of the Bill of Rights, is in these words: "This enumeration of certain rights shall not be construed to deny or disparage others retained by the people; and to guard against any encroachments on the rights herein retained, or any transgression of the high powers herein delegated, we declare, that every thing

7 P.                48

In the matter of J. L. Dorsey.

In this article is excepted out of the general powers of government, and shall forever remain inviolate; and that all laws contrary thereto are void."

By this it appears, not only that the rights asserted in this instrument, are reserved out of the general powers of government, but also that this enumeration shall not disparage others not enumerated ; and that any act of the legislature which violates any of these asserted rights, or which trenches on any of these great principles of civil liberty, or inherent rights of man, though not enumerated, shall be void.

It cannot, I think, be successfully maintained, that this last and not least important clause of the Bill of Rights, is void of meaning. Is it unreasonable to suppose that the framers of this declaration knew, that the principles maintained by the immortal British judges, cited in this opinion, as well as by the jurists of our own country, had been frequently called in question ; and that they intended to provide against every possible infraction of our free institutions ? Be this as it may, it is certain that many cases might easily be supposed, of flagrant enormity, of most undeniable injustice, and in direct hostility with the dearest rights of man, which are not forbidden by the bill of rights, if this clause has no effect.

We are not to construe this instrument as if it were a penal law, singling out individuals, and operating harshly on them : it is for the benefit of the whole, and should receive a large and liberal interpretation. Nor do I know of any sound canon of legal criticism, which would authorise its rejection. It is the most solemn act

In the matter of J. L. Dorsey.

of the people, in their sovereign capacity—dictating the terms on which they are willing to be governed; and it is ▓▓▓▓▓r duty and interest to preserve it unimpaired. ▓▓▓▓▓ now proceed to test the law in question by these principles, as well as by the express interdict of the bill of rights.

I have shown, that it cannot be supported by the express grant of power in the third section of the sixth article; so far, that allows disqualification from office.— It may however be supposed, that the clause just mentioned, contains two grants of power; the one just enumerated, and a general power to pass penal laws to prevent the evil practice of duelling. But the power to pass *general* penal laws for that purpose, must have been included in the high power conferred on the legislature by its creation with legislative powers; a special grant of the power, therefore, was nugatory and idle. I infer, therefore, that all that was intended by this article, was to authorise the legislature to make the offence of dueling, a disqualification from office. But if more was intended, and a further grant of power was made, to pass penal laws to suppress dueling, surely it was not an unlimited grant of power, but must be held subject to the same restrictions that the general grant of legislative power is.

This is a highly penal law—it excludes, unless its terms are complied with, all persons from practising as attorneys and counsellors at law in the courts of this State. It must therefore receive a strict construction, in accordance with well established principles, and the authority to pass it, be clearly and fairly derivable from the constitution.

In the matter of J. L. Dorsey.

The tenth section of the Bill of Rights, among other things, provides, that no one " shall be compelled to give evidence against himself, nor shall he be depr....  his life, liberty or happiness, but by due course o.....—After a patient and mature examination of the matter, I am of opinion, that the requisition of the expurgatory oath exacted by this law, offends against this portion of the bill of rights.   It is so offensive to the first principles of justice to require a man to give evidence against himself in a penal case,  that independent of the constitutional interdict, no one in this enlightened age will be found to advocate the principle.   But it may be said, this is not a case of this kind, as no corporal or pecuniary punishment is the consequence of a refusal to take the oath against duelling.   But are not the results the same, whether punishment follows from the admission, or is imposed as a consequence of silence.   Can ingenuity make a distinction between a punishment inflicted in this mode, as a consequence of the refusal to take the oath, by closing one of the avenues to wealth and fame, and a positive pecuniary mulct ?   If there be a difference, I think it entirely in favor of the latter, so far as the amount or weight of the penalty could affect the decision of this question.

In ascertaining the intention of the  people, in the reservation of certain great rights and privileges, we should give them  a broad and liberal construction,  so as to effect the manifest intention of its framers.    In this there is no danger.   They have asserted  that they have not delegated the power to invade either of  the great natural rights just cited.   Does it become this  court, or the

In the matter of J. L. Dorsey.

legislature, to quibble on its terms? If the mischief is as great in one case, as in the other, are not both included within the prohibition. With great deference to the opinion of others, who may differ from me in opinion, I think, that the requisition by the legislature, of this oath, in substance and effect, requires the applicant for a license to *give evidence against himself*; and that if not within the letter, is at least within the mischief of the prohibition;—the very foundation of which is, that every one is presumed to be innocent until the contrary appears.

But if it were admitted, for the purpose of this argument, that the legislature could prohibit all persons concerned in a duel from practising in the courts of the State, by making it a high penal offence, still the crime or offence must be ascertained by "*due course of law,*" according to the requisition of the tenth section of the bill of rights, just cited. The term "due course of law," has a settled and ascertained meaning, and was intended to protect the people against privations of their lives, liberty, or property, in any other mode than through the intervention of the judicial tribunals of the country.— But this law seeks to ascertain a fact, exalted into a crime, and punished in a peculiar manner, not by the judgment of a competent court, but by the admission of the offender, and construes his silence into evidence of guilt.

It may be again said, that there is no deprivation of life, liberty or property, consequent on a refusal to take the oath. I answer, that the law itself presumes the right to practice law, a valuable right, as it confers it as

In the matter of J. L. Dorsey.

a boon, on those who can, and are willing to take the oath. Can it be seriously contended, that it is not a valuable right, and as deserving of protection as property? Suppose the right to practice law, was confined to a particular class or order of men, by law, would it not be esteemed a most valuable privilege? And if the right of entering this fraternity could be purchased with money, would it not command a high price? I think there can be no doubt of it; and if so, exclusion from it must be the privation of a valuable right; as worthy of the protection of the law, as property? I think, therefore, that in this view, the law in question, is contrary to the spirit, the plain intent, and meaning of that part of the tenth section of the bill of rights, which provides, that "no one shall be deprived of life, liberty, or property, but by due course of law."

I am also of opinion, that the act in question, so far as it prescribes an expurgatory oath, as a condition to the practice of law in this State, (though passed with the most laudable motives,) is contrary to the very scope and design of a free government. The most arbitrary and vexatious inventions of tyranny, are those regulations of law, which interfere with the domestic concerns of society, by preventing the citizen from the pursuit of happiness in his own mode. The "pursuit of happiness" is asserted in the Declaration of Independence, to be an inherent right; and is promulgated as a self-evident truth. And certainly if that expression means any thing, it must include the right to select which of the various avocations or pursuits in life, a young man will engage in; his future destiny, and his value to the State, as one

In the matter of J. L. Dorsey.

of its members, demands the utmost freedom of choice;
and it is, therefore, of the highest importance, in a free
government, that this right of choice should not be im-
paired. But here is an act of the legislature, which pro-
hibits the candidate for wealth, and fame, and public
honors, from selecting the profession of the law, unless
he will take an expurgatory oath, that he has not been
guilty of a certain act or offence, and that he will not be
guilty in future.

"I am unable to distinguish this, in principle, from the
test oaths, which have stained the statute books of other
countries. I admit, that the object in view is more
praiseworthy, than was the object of those who disfran-
chised their fellow citizens for supposed heresies in reli-
gion, or for errors of political belief; but in principle I
think they are the same. Indeed it may well be ques-
tioned, whether in so far as future good conduct is re-
quired to be stipulated for on oath, by the act in ques-
tion, it does not violate the rights of conscience. Judge
Roane, in Mr. Leigh's case, which arose on a statute simi-
lar to ours, expresses himself thus: "However laudable
the act to suppress duelling may be, it is still a highly
penal law, and must be construed strictly. It is unusu-
ally penal, if not *tyrannical*, in compelling a person to
stipulate on oath, not only in relation to his past con-
duct and present resolution, but also for the future state
of his mind; and his future conduct with respect to the
offence in question, under all possible circumstances; a
stipulation which many consciencious persons, however
prepared to take the oath as regards the time present,
might well hesitate to enter into."

In the matter of J. L. Dorsey.

The resemblance of the requisition of the oath, in the act to suppress duelling, to a test oath, is more apparent when we consider, that the oath required to be taken, does not describe any offence known to our law. The oath is in these words: "I, ——— ———, do solemnly swear, that I have neither directly nor indirectly, given, accepted, or knowingly carried a challenge, in writing or otherwise, to any person or persons, (being a citizen of this State,) to fight in single combat or otherwise, with any deadly weapon, in or out of the State, or in any manner aided and abetted in the same, since the first day of January, eighteen hundred and twenty-six; and that I will neither," &c. &c. As the law stood previous to the year eighteen hundred and nineteen, to deliver, offer, send, or accept a challenge to fight a duel, was an offence punishable by law, whether any duel was fought in pursuance of such challenge or not; but by the law, as it now stands, the mere sending or accepting a challenge to fight a duel, is no offence punishable by law, unless the duel be actually fought. This point has been determined by the Supreme court, in the case of Smith vs the State, (1 Stewart, 506.) It follows, therefore, that the act requires the applicant for a license to practice law, to swear that he has not, since the year eighteen hundred and twenty-six, or since he has been a resident of the State, done certain acts, and that he will abstain from so acting in future, which acts constitute no crime or offence known to our law.

It is conceived that the very essence of a test oath, is the prohibition to entertain certain religious or political opinions, which do not expose to punishment, but which

In the matter of  J. L. Dorsey.

merely exclude from office, the holder of them.   The enormity of test oaths consists mainly in this, that there is nothing in the opinions themselves required to be abjured, which unfit the person holding or maintaining them from filling the offices or dignities of the State, but merely that such is the exaction of the law.   But if exclusion from office on such grounds, is justly considered incompatible with free institutions, how much more objectionable is it in principle, when the test is sought to be applied, not to the tenure of office, but to the walks of private life.   For it if be true, as I think I have shown, that an attorney or counsellor at law, is not an officer within the meaning of the constitution, then there is no more reason or propriety, in exacting the oath against duelling from an attorney at law, than there would be in demanding it from a physician, from a planter, or from any other class of the community.

Attorneys and counsellors at law, having to manage the business of others, and having important interests entrusted to their charge, it is proper that they should be of good moral character, and reasonably skilled in the law.   There can be no possible objection to requiring from them an oath of fidelity to their clients.   This appertains to the duties of their employment, and is in harmony with other similar provisions in our code, in reference to persons who fill *quasi* offices : such, for example, as is required of executors and administrators.   But if this plain and intelligible ground is abandoned—if it be conceded that the legislature can impose as the price of filling these stations, an oath, not appertaining to, or in any manner connected with their employments—the same

7 P.                                49

process of reasoning which conducts to the conclusion that such oaths are constitutional, will authorise the imposition of a political test, as the qualification not only of those who may desire these employments or *quasi* offices, but also of the offices created by the constitution.

The constitution has, in terms, prescribed the oath which the officers of the State government shall take. This, by necessary implication, excludes the imposition of any other oath as a qualification to office under the State government. It is true, the third and fourth sections of the sixth article, confer on the legislature the power to exclude from office, persons guilty of certain offences, but I deny that the commission of these offences can be ascertained by the oaths of the accused. It is not necessary that their existence should be thus ascertained, to give effect to the law. It is a mode unknown to the common law, and forbidden by the bill of rights. It follows, therefore, that if attorneys and counsellors at law, can be considered as officers within the meaning of the constitution, no oath of office can be prescribed by the legislature, other than the one provided in the constitution.

As I do not doubt that the law in question has had a salutary operation in restraining the barbarous practice of duelling, I lament the necessity which has been cast upon me, of determining that it is void; and if I could entertain a reasonable doubt of the correctness of the conclusions I have attained, I should give it my sanction: I am, however, sustained by the reflection that it is in the power of the legislature to accomplish this desirable object—so far at least as law can operate, without infringing on the constitution.

In the matter of J. L. Dorsey.

I have stated my objections to the law under discussion, with the freedom which the station I hold demanded; and have put that construction on the constitution, which I think best comports with the intention of its framers. It may be thought by some, that many of the objections I have stated are visionary, and never likely to occur in practice—that it is not fair in argument to put such extreme cases, as the passage of a law requiring a political test. I answer, that I do not suppose it probable that the legislature will so act. But the judicial tribunals, in expounding a law, with the reference to its constitutionality, must say whether the constitution warrants it or not—not whether the invasion of the constitution, if there be one, is likely to be prejudicial. The legal presumption is, that all violations of the constitution are prejudicial. Experience teaches, and all history shows, that there is but one mode of preserving free institutions in their purity, and that is, by resisting the first attempt to overleap the prescribed boundary.

For the reasons given, I am of the opinion that so much of the sixteenth section of the act on the subject of duelling, as requires the oath therein prescribed to be taken by attorneys and counsellors at law, is contrary to the constitution, and therefore void.

COLLIER, C. J.—With a view to perspicuity, I will consider, First: In what manner attorney's at law are admitted to the bar; Second: The character of the trust acquired by a license to practice as an attorney and counsellor at law, and the rights it confers; and Thirdly: How such a license may be revoked or annulled.

In the matter of J. L. Dorsey.

*First.* Every one required by the King's Writ to appear, by the common law, was obliged to appear in person, but after his appearance, it was competent for the *Chancery, King's Bench, Common Pleas,* or other court which held *plea by writ,* to admit him by attorney : And even a court holding plea, without writ, might allow that privilege, if the King had granted a writ *de attornato faciendo*—(1 Com. Dig. 748;) (Crabb's Com. Law, 118.) So the King, by virtue of his prerogative, by grant either under the great or privy seal, might authorise the plaintiff or defendant in any suit, to make an attorney, and order the court to admit the attorney appointed, either naming in the authority issued for that purpose, some particular attorney, or else giving leave to the party to make *quem aut quos voluerit.* And the King might grant to a party, power to make a general attorney in all pleas *motis vel movendis* in all courts—(Ibid and 1 Bac. Ab. 288.)

By several English statutes, the first of which is the statute of Merton, (20 Hen. 3 ch. 10,) attorneys are allowed to be made in particular courts and cases; but the common law, as applicable to courts and cases in general, remained without change until the statute of Westm. 2, (13 Edward I, ch. 10,) which authorised persons impleaded for tenements in Eyre, or in B. R. or assize, in County court, or court baron, to make a general attorney to sue for them in all pleas, moved for or against them, during the circuit, &c. This statute has been followed by many others providing for the admission and regulation of attorneys—(1 Com. Dig. 741 *et post;* 1 Bac. Ab. 288, *et post.*) And rules have been adopted from time

In the matter of J. L. Dorsey.

to time by the higher courts in England, upon this sub-
ject, on the ground that attorneys are officers of the courts
in which they practice, and subject to their control and
direction.

In the different States of the Union, the rules are va-
rious in regard to the qualification and admission of at-
torneys. They are prescribed either by statute or rules
of court; all of which impliedly assume the practice of
the law to be a *privilege* to which the legislature may
attach such conditions as its wisdom may dictate—Grif-
fith's Reg. Commonwealth vs Judges of Cumberland
county, (1 Serg. & R. 187;) Anon, (4 Johns. R. 191;)
Ex parte Sayre, (7 Cowen's R. 368.)

In this State, several statutes have been enacted upon
the subject. The first in the order of time is the act of
eighteen hundred and seven, which inhibited every per-
son from practising as counsellor or attorney at law, in
any of the courts of the then territory, who should not
previously produce a license, and take (in the presence of
the court) an oath to support the constitution of the Uni-
ted States, as well as an oath to demean himself honestly
as counsellor or attorney, and in all respects, to execute
to the best of his abilities, his "*office.*" And it is further
declared, that every person convicted of any felonious
crime, shall be incapable of obtaining such license; or if
licensed, the judge of any court in which such person
may practice, on proof thereof being made, may *suspend
his license*—(Aik. Dig. 43, 44.)

The statute of eighteen hundred and nineteen, enacts
"that no person shall be permitted by any court, to prac-
tice therein as counsellor or attorney at law, unless he

In the matter of J. L. Dorsey.

shall have obtained a license from the Supreme court of this State; and it shall be the duty of said court, when application shall be made by any person as aforesaid, on his producing satisfactory evidence that he sustains a good moral character, to examine, or cause to be examined, in open court, the person so applying: and if after such examination, it be the opinion of said court that he is duly qualified, it shall be the duty of the judges thereof, to grant a license under their hands and seals, which shall be attested by the clerk of said court." This law contains a *proviso*, excmpting from its operation, all persons theretofore regularly licensed. And the statute itself was so far modified, by an act of eighteen hundred and twenty-one, as to allow any two judges of the Circuit courts to grant licenses to attorneys to practice in the Circuit and County courts.

By an act of eighteen hundred and nineteen, all applicants for admission to the bar, together with persons elected to civil or military stations or offices, were required to declare upon oath, that they had not been guilty of having given, accepted, or carried a challenge to fight, &c. and that they would not be guilty, &c.— This act was slightly modified by a statute of eighteen hundred and twenty-six, which prescribes the following oath, to be taken by counsellors and attorneys at law, and persons elected to civil or military office, &c. " I, —— ——, do solemnly swear, (or affirm, as the case may be,( that I have neither directly nor indirectly given, accepted, or knowingly carried a challenge, in writing or otherwise, to any person or persons (being a citizen of this State,) to fight in single combat or otherwise, with

In the matter of J. L. Dorsey.

any deadly weapon, either in or out of the State, or aid-
ed or abetted in the same, since the first day of January,
one thousand eight hundred and twenty-six; and that I
will neither directly or indirectly give, accept, or know-
ingly carry a challenge in any manner whatsoever, to
any person or persons (being a citizen of this State) to
fight in single combat or otherwise, with any deadly
weapon, in, or out of the State, or in any manner what-
soever aid or abet the same during the time for which I
am elected, or during my continuance in office, or dur-
ing my continuance in the discharge of any public func-
tion." And upon the failure or refusal by any attorney,
or counsellor at law, to take the oath provided by the
act, it is declared, that he shall not be permitted to prac-
tice as such in any court in this State. Persons emigrat-
ing to this State, after the first day of January, eighteen
hundred and twenty-six, before they enter upon the
discharge of any public function, are required to take
the oath quoted above, so modified as to make it relate
back to the time they became citizens of the State.

In addition to the oaths provided by the several sta-
tutes referred to, the act last cited, requires that attor-
neys at law, shall take the oath directed by the consti-
tution to be taken by all officers, which is as follows:
" I solemnly swear (or affirm, as the case may be) that
I will support the constitution of the United States, and
constitution of the State of Alabama, so long as I conti-
nue a citizen thereof, and that I will faithfully dis-
charge, to the best of my abilities, the duties of —— ——,
according to law. So help me God."

The only rules of court we have, applicable to the li-

cense and qualification of attorneys, relate alone, to the particular days of the term, on which, applicants for admission are to be examined. And having shown the manner in which attorneys are admitted to the bar, I proceed to consider the second point.

*Second.*—It will result from what has been already said, that the right to exercise the functions which pertain to *the profession of the law*, is not an absolute right derived from the law of nature, but it takes its origin in the institutions of the social state; and by these it is regulated. A license to *practice law*, confers a mere franchise or privilege; and is granted by the legislature, through its organ the Supreme court, in the one case, and two judges of the Circuit courts, in the other, to persons applying, who may discover the proper legal attainments, and exhibit satisfactory evidence of good moral character. The license thus obtained, confers no rights in itself,—it is conditional, depending for its efficacy, upon taking the oaths prescribed by law : when the licenciate has taken these, he is then, and not sooner, invested with the character of an attorney and counsellor at law; and entitled to exercise the privileges, and bear the responsibilities, which belong to his situation. No one can claim an admission to the bar as a matter of right. The legislature, in authorising the merits, (both moral and scientific) of the applicant to be scanned, have given to the licensing power, a discretionary jurisdiction over the subject. (Burr's case, 1 Wheeler's Crim. Cases, 505.—Leigh's case, Roane's opinion, 1 Munf. R. 481.)— Hence it is, that a *mandamus* will not lie, commanding the judges of an inferior court to admit a person to prac-

In the matter of J. L. Dorsey.

tice as an attorney there; but if it be grantable at all, it can only be to examine his testimonials of character, and to enquire of his knowledge of the law.—(Rex vs York sh'ff—3 B. & Adolp. 770.)

Nor does an attorney and counsellor at law, *as such,* hold an office under the government. An office in legal language, say the Supreme court of New York is, " An employment on behalf' of the government, in any station, or public trust, not merely *transient, occasional, or incidental.* In common parlance, the term has a more general signification. Thus we say, the office of executor or guardian; or the office of a friend. In my judgment, an attorney or counsellor does not hold an *office,* but exercises a *privilege* or *franchise.* As attorneys or counsellors, they perform no duties on behalf of the government; they execute no public trust. They enjoy the exclusive privilege of prosecuting suits for clients who may choose to employ them."—(In the matter of attorneys' oaths; 20 Johns. R. 492.) And the Court of Appeals of Virginia, in considering the nature of the trust acquired, by an admission to the bar, say—"There is no just ground on which we can erect, by implication or construction, into *governmental* officers, those who, in *England,* are not exalted to that character, and who, in the only books and doctrines handed to us on the subject from that country, are held, at most, to be mere subordinate officers of *their respective courts.* But if attorneys could even be considered as officers of the government, they do not hold an office of *profit* or *emolument* under the government; otherwise they would have been excluded from a seat in the legislature, by the constitu-

tion; which has never been done nor attempted in relation to mere attorneys, however it may as to those who are "appointed" to prosecute for the commonwealth, and receive a salary therefor.—(Leigh's case, Roane's opinion, 1 Munf. R. 483.)

In the case of Woods, (Hopk. Ch. R. 6,) Chancellor Sanford was of opinion, that the station of an attorney or counsellor was *an office* or a *public trust,* within the meaning of the constitution of New-York. And in Seymour vs Ellison (2 Cowen's R. 13,) Chief Justice Savage declared his acquiescence in the correctness of the chancellor's opinion; though in the latter case, the point does not seem to have been determined.

Taking the law to have been correctly adjudged, in the cases cited from 20 Johns. and 1 Munford, an attorney may be said to hold a *privilege* or *profession,* acquired under the sanction of legislative authority, for which, he renders no direct equivalent to the State, but undertakes *expressly,* that in its exercise, his course shall be characterised by integrity and patriotism; and, in addition to the oath against duelling, he impliedly stipulates, that he will not commit a felony or other crime founded in moral turpitude.

The common law, has its foundation in an enlightened and elevated morality: its aim is single—the administration of justice, upon principles of moral right; and to this end, it is guided and controlled by rules and principles applicable to every state of facts and circumstances. The attorney and counsellor, who must be presumed to be peculiarly conversant with the *science,* is largely concerned in the administration of justice, and

In the matter of J. L. Dorsey.

placed in a situation, in which, if he regard the promptings of evil, he may inflict upon others, the severest injury, and greatly impair the tone of public morals.

The science of the law, when properly understood and appreciated, inspires to noble and generous effort. The pursuit of the virtuous and enlightened lawyer, is most honorable. He cherishes, with ardent feelings, benevolence, charity, and all the virtues which elevate man in the scale of moral beauty. He explores the abstruse and obscured learning of other ages, that he may the more successfully protect the weak, vindicate the innocent, and punish the oppressor—looking to the consciousness of having performed his duty for his chief reward; and seeking that consideration, which intellect, directed by virtue and industry, will always secure.—To maintain the respectability and honor of a profession, which is capable of exerting so extensive an influence, and of consequence, to protect individual interests, the law has wisely provided checks for the consciences of its members.

The right conferred, by an admission to the bar, is irrevocable; unless the attorney, was then, unworthy of the profession, or afterwards committed some act, or omitted some duty, which the law determines to be, in itself a forfeiture of his functions, or a sufficient cause for the vacation of his license. If he commit a breach of the conditions, on which he is admitted to the bar, he forfeits his trust in the same manner as the grantee of a public franchise does, who omits to perform the terms on which it is granted—(City of London vs Vanacre—12 Mod. R. 271—Bank of New-York vs Stryker—1 Wheeler's Crim. Law, 330.)

I am now brought to consider the third point.

*Third.*—It is well settled, that at common law, an attorney may be disbarred, or, as it is most usually called, *stricken off the roll,* in a summary way, for dishonesty in his practice, or other sufficient cause.—(1 Bac. Ab. 306; 1 Com. Dig. 761 ; Leigh's case, *Leigh arguendo,* 1 Munf. R. 470 ; Bank of New-York vs Stryker—1 Wheeler's Crim. Law, 330 ; In matter of Sh'ff, &c. of New York, on complaint of McClelan—ibid, 319 ; Burr's case—ibid, 503; Darby's case—3 Wheeler's Crim. Law ; 1 Anon. ; 2 Cowen's R. 589 ; State vs Holding—1 McC. R. 379 ; Burr's case—9 Wheat. R. 529; Anon. ; 2 Hals. R. 162 ; Ashton's case—1 Mod. R. 41 ; *ex parte* Troy—1 Mod. R. 6 ; *ex parte* Hill and Hargrave—2 Bla. R. 991 ; Brownsall's case—Cowp. R. 829; The King vs Southerton—6 East's R. 126; Anon. ; 1 Chitty's Rep. 557 ; In the matter of —— 1 D. & R. 529; Smith vs Mathan—4 D. & R. 738.) So, if one was admitted to the bar, whose moral character was previously such as to render him undeserving of a license, he may be excluded from the profession. Thus, in the matter of Dormenon, (1 Mar. R. 129,) a rule was entered against Mr. Dormenon, to shew cause why his name should not be stricken from the roll, as an attorney and counsellor at law, on the grrund that he had aided and assisted the negroes of St. Domingo, in massacreing the white people in seventeen hundred and ninety-three. The court declared, that if they had been in possession of these facts, Mr. Dormenon's application would have been refused ; and the court now having evidence of them, it was their duty to exclude him. And the rule was made absolute.

In the matter of J. L. Dorsey.

The right to proceed summarily against attorneys, for ill practice, &c. is considered, at common law, to rest upon the ground, that an attorney is an officer of the different courts before which he practices—(1 Bac. Ab. 306,) —and to result from the discretionary power to admit attorneys and counsellors to the bar.—(Burr's case, 1 Wheeler's Crim. Law, 505.) But, Hawkins, in his Pleas of the Crown, (2 vol, 2 B. ch. 22, sec. 30,) in treating of *barristers*, remarks—that notwithstanding they are neither officers of any court, nor invested with any judicial office, but barely practice as counsellors, yet, in as much as they have a special privilege to practice the law, and their misbehavior tends to bring a disgrace upon the law itself, they are punishable for any foul practice as the ministers of justice are.

In the case of Niven, (1 Wheeler's Crim. Law, 337, *in note*,) an attempt was made to distinguish between the responsibility of an attorney and a counsellor; whereupon it was said, "They are both licensed by the court: nor can they engage in professional employment without its special permission. This permission can only be obtained by evidence of ability and integrity. Both are deemed requisite to a candidate for admission, before he is considered worthy of being entrusted with the protection of the property and the vindication of the rights of his fellow-citizens; and it would seem to follow, that the same power which conferred, ought to be authorised to withdraw, this permission whenever those valuable purposes are abused." And again, "It would be strange indeed, if this vigilance should be required towards those who were passing the threshhold of our courts, and that

when once admitted, they should bid defiance to restraint, and with impunity be guilty of acts, which would have debarred their entrance. · If the great purposes of justice require this early caution, and this careful examination, they still more imperiously demand the same watchfulness over those, who have been presented to the public as deserving of their confidence and patronage. The case of Burr (before cited) was brought before the Supreme court of the United States, upon an application for a *mandamus* to restore him to the bar; when the court remarked, that "The right to dismiss an attorney from his profession, is incidental to all courts, and is necessary for the preservation of *decorum*, and the respectability of the profession"—(9 Wheat. R. 529.)

The common law procedure against attorneys for improper practice, has been modified in this State, by an act passed in eighteen hundred and seven, "concerning counsellors and attorneys at law," which so far as need be noticed, is as follows: "If any of the judges of the Superior courts, from their own observation, detect any mal-practice in the said courts, in any counsel or attorney of those courts; or if complaint in writing be made to them of such mal-practice in the said courts, or in the County courts of any county, the party accused shall be summoned to shew cause why an information should not be filed against him: and if such information should be ordered, and the counsel or attorney so offending should be found guilty of the matter therein charged, the said judges of the Superior courts may either suspend his license during a certain time, or vacate it alto-

In the matter of J. L. Dorsey.

gether, as they shall deem most proper; first ordering a jury to be empannelled for the trial of such information." Thus, instead of exhibiting charges and calling upon an attorney to shew cause, why he should not be stricken from the roll, he is required to shew cause why an information should not be filed against him; the allegations of which he is entitled to have tried by a jury.

It has been shown, that the *licensing authority* have a discretionary power over the ap; lication of individuals seeking admission to the bar,—that without a "special permission," no person has the right to assume the functions of an attorney and counsellor at law,—that this right, when acquired, is at most, a mere privilege to practice that profession, so long as the attorney shall approve himself worthy of its honors, or do no act operating a forfeiture, but subject to be withdrawn, whenever his misconduct shall be such as to authorise his exclu sion from the bar. This view has been taken, that it might be seen, that no absolute or positive right of the citizen was involved in the subject, and that it was of consequence, open to legislative regulation.

Having settled the general proposition, that the legislature may prescribe the qualifications of an attorney and counsellor, and the causes for which they may be excluded from their profession;—we will now enquire whether the oath prescribed by the act to suppress the "evil practice of duelling," is incompatible with any provision of the constitution.

The arguments on this point have been elaborate and ingenious, and present the following inquiries: 1. Is the legislative authority dependent upon the grants con-

tained in the constitution, or cannot that department exercise such powers as are not expressly or impliedly withholden ?   2. Does the constitution inhibit expressly, or by some incompatible grant or prohibition, the enactment of the act of eighteen hundred and twenty-six, as it regards its operation, and the manner of its operation on attorneys and counsellors at law ?

1. The powers possessed by the federal government are conventional, and it can exercise none others than those conferred, for it owes its existence, its nature and its continuance, to the agreement of its members, as evidenced by a written constitution.   But in regard to the authority of the State, the legislative power is not derived from a constitutional grant—it was possessed previous to the formation of its constitution, and is but regulated and controlled by that instrument.   This distinction between the federal and local legislatures rests upon such clear principles, that it will be needless to enlarge upon the proposition, by the employment of any reasoning of our own.   Mr. Madison, in discussing the supposed danger from the powers of the *Union* to the State governments, remarks: "The powers delegated by the proposed constitution, to the federal government, are few and defined.   Those which are to remain in the State governments are numerous and indefinite.   The former will be exercised on external objects, &c.   The powers reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties and properties of the people ; and the internal order, improvements, and prosperity of the State"—(Federalist, No. 45.)   In Golden vs Prince, (3

In the matter of J. L. Dorsey.

Wash. C. C. R. 313,) Mr. Justice Washington considered
that the State, in the adoption of the federal constitution,
retained the right to make such laws as they might
think proper, within the ordinary functions of legisla-
tion, if not inconsistent with the powers vested exclu-
sively in the Government of the United States, or not
forbidden by some article of the constitution of the Uni-
ted States or of the State; and such laws were obligatory
upon all the citizens of that State, as well as others who
might claim rights, or redress for injuries under those
laws.   So, in Barker vs the People, (20 Johns. R. 457,)
it was held that " the powers of the legislature were not
conferred by any express grant, but result from the in-
stitution of a supreme legislature.   It is an axiom, that
the legislature possess all power, not expressly forbidden
either by the constitution of the State or of the United
States, which relates to the prevention of crime, or the
well ordering of society."   And in the State vs McDon-
ald, (4 Porter's R. 465,) this court say that " the Congress
of the United States possesses only such powers as are de-
legated, or such as are necessary to give effect to those
that are expressly delegated.   Our legislature looks not
to the constitution for a grant of powers, but exercises
all such as are compatible with the social compact, un-
less restrained by express inhibition or clear implica-
tion."   Let these citations suffice to show, that while
the constitution of the United States is an enabling char-
ter, the constitutions of the States are instruments of re-
straint and limitation upon powers already plenary; and
that it is competent for the legislature of a State to adopt
such measures within the appropriate sphere of legisla-

7 P.                        51

tion, as are not inhibited either expressly or by implication.

2. Upon the second branch of the argument, it is insisted, that the constitution having made it the "duty of the general assembly, as soon as circumstances will permit, to form a penal code, founded on principles of reformation, and not of vindictive justice," (19 sec. 6 art.) has thus limited the power of the legislature, over the subject of criminal jurisprudence.

This provision, it is conceived, is addressed to the legislature merely, and invests it with a large discretion in determining what *circumstances* are favorable to the performance of the duty it enjoins, as well as great latitude in adjusting the proportion between punishment and crime. And if, in the opinion of the legislature, the time has not yet come when the "penal code" shall be remodelled, that opinion cannot be revised, nor can legislative action be accelerated by a co-ordinate department of the government. Nor can this constitutional injunction impair the force of particular laws for the *prevention* or *punishment of crime*, enacted previous to the formation of the code contemplated by the constitution.

It has been further argued, that the tenth, eleventh, twelfth, twenty-seventh, and thirtieth sections of the first article, and the third section of the sixth article of the constitution, inhibit the requisition of the oath prescribed by the act of eighteen hundred and twenty-six. The tenth section secures to the accused, the right to be heard by himself and counsel; to demand the nature and cause of the accusation, and have a copy thereof; to be confronted by the witnesses against him; to have com-

In the matter of J. L. Dorsey.

pulsory process for obtaining witnesses in his favor; and in all prosecutions by indictment or information, a speedy public trial by an impartial jury of the county or district in which the offence shall have been committed: It declares further, that he shall not be compelled to give evidence against himself, nor shall he be deprived of his life, liberty, or property, but by due course of law. This section applies professedly to criminal prosecutions; but conceding that it refers to such as are *quasi* criminal, and what influence can it exert upon the application we are considering? Had not the applicant declined the relinquishment of his profession, it is true, that in order to his suspension from its functions, it would have been necessary for some court having jurisdiction, to have adopted coercive measures to effect that end; when he might have insisted (under an equitable construction of the act of eighteen hundred and seven,) upon a trial by jury. Instead, however, of taking that course, the applicant has with greater propiety withdrawn from the practice of the law, and now, instead of defending himself against a proceeding contemplating his removal, he is seeking a re-admission; so that the inquiry does not properly arise, whether he has been irregularly deprived of a privilege. It is, however, argued, that the anti-duelling act of eighteen hundred and twenty-six, is obnoxious to the provisions of this section; because, in effect, it compels a man to give evidence against himself, and because it does not make a verdict and judgment of guilty, indispensable to an infliction of its penalties. This argument (with all deference,) assumes as a fact, that which seems to me to be false. It supposes that a

man, in asking admission to the bar, does not act from
volition, but under the influence of coercion, and if guil-
ty, that he is compelled to disclose his guilt of having of-
fended against the laws to suppress duelling. I have
already shewn, that the right to practice law is a mere
privilege, which no one is constrained to ask or receive,
and that in determining the propriety of granting it, the
licensing power is, for the public good, invested with a
large discretion.

The oath prescribed by the act of eighteen hundred
and twenty-six, does not, in terms, require the party ta-
king it, to make a disclosure of any fact or facts affir-
matively:—it merely requires him to disavow his guilt
of having *given, accepted, or carried a challenge to fight,
&c.* If guilty of having done either one of these, he has
only to remain silent—but if it were possible to consider
the oath as equivalent to an affirmation, directly the re-
verse of its terms, yet it would disclose no crime for
which a party could be subjected to punishment accor-
ding to the usual forms of criminal procedure. To *give,
accept, or carry a challenge to fight,* &c. unless a fight ac-
tually ensues, is not a crime known to the laws of this
State—Smith vs the State, (1 Stew. R. 506.)

The latter part of this section, declares that "the ac-
cused shall not be deprived of his life, liberty, or proper-
ty, but by due course of law." The terms "life, li-
berty or property," speak their own meaning, and clearly
refer to the three great interests—human life—personal
liberty—and private property, which it was the object of
civil government to protect. By "due course of law,"
we are to understand those forms of arrest, trial and

In the matter of J. L. Dorsey.

punishment, guarantied by the constitution, or provided by the common law; or else such as the legislature, in obedience to constitutional authority, have enacted to ensure public peace, and elevate public morals. The twenty-ninth article of *Magna Charta*, declares that no freeman shall be deprived "of life, liberty, or property, but by the judgment of his peers, or the law of the land." Yet this has never been considered as inhibiting the right of courts of judicature to punish for contempts, or to disbar an attorney without the intervention of a jury—Darby's case, (3 Wheeler's Crim. Law, 5.) The power to proceed summarily in these cases was considered as important to the respectability and influence of the bench, and the administration of justice in its purity. The terms employed in *Magna Charta* have a meaning quite as extensive as those used in our constitution, and the judicial exposition of the one, should be taken as a guide to the proper understanding of the other.

The eleventh section declares, " that no person shall be accused, arrested, or detained, except in cases ascertained by law, and according to the forms which the same has prescribed ; and no person shall be punished, but in virtue of a law, established and promulgated prior to the offence, and legally applied." This provision merely declares, that acts dispunishable by any pre-existing law, shall not afterwards be made criminal; and that in all public accusations, arrests or detentions of the person—the *laws*, and the *forms prescribed* by *them*, must be followed.

By the twelfth section, it is declared that " No person shall, for an indictable offence, be proceeded against

criminally, by information; except in cases arising in the land and naval forces, or the militia when in actual service, or, by leave of the court, for oppression or misdemeanor in office." Without stopping to inquire whether at common law, it was an indictable offence, to *give, accept, or carry a challenge to fight, &c.,* it is enough to remark, that the application we are considering, involves no criminal proceeding against the applicant.— And it is clear, that neither this nor the preceding section can have any influence upon the validity of the statute of eighteen hundred and twenty-six.

It is difficult to conceive the application of the twenty seventh section, which merely declares, that " emigration from this State shall not be prohibited, nor shall any citizen be exiled." There is certainly a great difference between exiling a citizen under a judgment of expulsion, and the refusal to grant a privilege or franchise, or even its withdrawal, in consequence of some act done, which the law has made a disqualification, or a cause of forfeiture. In the one case he is forced from his country—in the other, he remains—free to engage in all pursuits, but those which are authorised as public boons.

The thirtieth section declares, that " this enumeration of certain rights shall not be construed to deny or disparage others retained by the people: and to guard against any encroachment on the rights herein retained, or transgression of any of the high powers herein delegated, we declare that every thing in this article is excepted out of the general powers of government, and shall forever remain inviolate ; and that all laws con-

In the matter of J. L. Dorsey.

trary thereto, or to the following provisions, shall be void." This section is the last of the "Declaration of Rights;" and was doubtless inserted *ex majore cautela*—lest it should be supposed that an article intended to embody certain fundamental rights of the citizen, should be construed as yielding up others, and throwing them into the general mass of governmental powers, and even impair *proprio vigore*, the limitations imposed in the subsequent parts of the constitution, upon legislative authority. It, however, serves to shew, that the "Declaration of Rights" is, what its title imports—an article to restrain, and not to extend power. The terms, "that every thing in this article is excepted out of the general powers of government, and shall forever remain inviolate," inculcate that idea with all the force that can be imparted to language, and prove that the general powers of government would continue without an express constitutional recognition. This provision, then, so far from shewing that the legislature has no warrant for the enactment of laws not expressly authorised, or necessary to give an effect to an express grant, proves its competency to adopt regulations, not repugnant to the constitution.

I will now inquire, whether the act of eighteen hundred and twenty-six, so far as it professes to operate upon attorneys and counsellors at law, is in derogation of the third section of the sixth article of the constitution. That section is as follows : "The general assembly shall have power to pass such penal laws to suppress the evil practice of duelling, extending to disqualification from office, or the tenure thereof, as they may deem expedient."

Here is a clear grant of authority to pass "laws to suppress the evil practice of duelling." Had there have been a more general delegation of power, without the latter member of the section, it might well be questioned, whether the legislature could have made an observance of the anti-duelling laws an essential qualification for office. The constitution having declared who were eligible to office, and prescribed the oath to be taken by officers, might be construed as denying to the legislature, the right to impose other disabilities or tests. But to remove all doubt upon this head the legislature is authorised to extend the penalties of the anti-duelling laws, " to disqualification from office, or the tenure thereof."— Instead then, of the latter member restraining the first part of the section, it should rather be taken to enlarge its meaning, and to confer a power, which, if it existed independently, was at least, very questionable. The argument, that *an authority* to disqualify " from office," *excludes the idea*, that the right to exercise any privilege, grantable by the public, can by *law* be forfeited or withheld, is, according to my exposition of the section, entirely indefensible. Privileges or franchises, not particularly provided for by the constitution, are subject to such general regulations as the legislature may prescribe.— The " general powers of government," without any enabling grant, concede this much virtue to legislation.— In Leigh's case (1 Munf. R. 468,) it appears, that an act was passed by the legislature of Virginia, requiring that after its passage every person appointed to any office or place, civil or military, under that commonwealth, should, in addition to the oath now prescribed by law,

In the matter of J. L. Dorsey.

take the following oath: " I do solemnly swear (or affirm, as the case may be) that I have not been engaged in a duel, by sending or accepting a challenge to fight a duel, or by fighting a duel, or in any other manner, in violation of the act, entitled an act to suppress duelling, since the passage of that act; nor will I be so concerned, directly or indirectly, in such duel, during my continuance in office." In that case, two questions were raised.

1. Were attorneys at law, as such, *appointed* to " office or place, under the commonwealth? "

2. Was the act itself constitutional?

Judge Tucker, in remarking upon the second question, observes, " On the present occasion I have not felt, nor do I feel the same lest doubt of the constitutionality of the act in question; the object of which appears to be, the prevention of a great moral and growing evil; and the provisions of it, so far as I have had occasion to consider them, well calculated to advance the benefit of society, and suppress the evil."

Judge Roane observed—" As to the question of the constitutionality of the act to suppress duelling, the foregoing view of the case renders it unnecessary for me to say any thing upon it. I do not see, however, at present, that it can be deemed unconstitutional, as it relates to the qualification of attorneys at law or counsel; unless indeed it be on the broad ground of the injustice, if not tyranny, of compelling a man to swear, *in advance*, that he will not, for a given time, do or forbear to do any given act, a thing which tender and scrupulous consciences, however resolved at present, might well hesitate to do." The foregoing view referred to by Judge

7 P.                    52

Roane, as relieving him from a consideration of the objection to the validity of the act, was his conclusion, that it did not embrace attorneys.

In New-York, a statute was passed to suppress dueling, which required any member of the Senate or of the Assembly, and every person who should be elected or appointed to any office or place, civil or military, except town officers; and every person who should be admitted a counsellor, attorney or solicitor of the court of chancery, supreme court, or court of common pleas, &c. to take an oath that he had not been engaged in a duel, &c. The question, whether this act was constitutional, was made in Barker vs The People, (20 Johns. R. 427,) and was determined to be an enactment clearly within the competency of the legislature.—(See also, ibid. 492.)

The statute of New-York, like that of Virginia, required a person appointed to office, &c. to take an oath that he *had not been* engaged in a duel, by giving, accepting, or carrying a challenge to fight, &c.;—while that of the latter state, required the party to swear, that he would not be guilty of such an act. Yet neither of these laws was considered objectionable, as being inquisitorial, in requiring an individual to declare himself guiltless of a particular act; or in other words to maintain by his own oath, his legal qualifications for a public franchise. It may be remarked, that the old constitution of Virginia, conferred no power to enact penal laws—and the constitutions either of that state or New-York, contains no authority to adopt measures to suppress duelling.

Here we have the authority of two courts, of high respectability, to shew—

In the matter of J. L. Dorsey.

1. That a State possesses "the general powers of government," apart from its constitution.

2. In the absence of any fundamental inhibition, the legislature may test the qualifications of a party seeking to enter upon the enjoyment of an office or privilege, by requiring an abjuration of *that* which disqualifies.

3. That the validity of a statute, imposing a test for *office* or *privilege*, will not be impaired, if it annexes disqualification to an act, which does not affect the capability of the man or the officer, for a discharge of the functions of his office.

But it is argued, that the act of eighteen hundred and twenty-six, in excluding from the bar those who have, or may offend against its provisions, inflicts a punishment, both cruel and unusual, and is therefore repugnant to the sixteenth section of the "Declaration of Rights," and the eighth amendment to the constitution of the United States. The disfranchisement of a citizen is not an unusual punishment, at least in that country whence we derive the most of our legal notions ; and our constitution clearly does not contemplate it as cruel: else why should it enjoin it upon the legislature to make laws to exclude from office, &c., those who shall be convicted of *bribery*, *perjury*, *forgery*, or other high crimes or misdemeanors, in addition to granting the authority to enact laws to suppress " the evil practice of duelling," extending to disqualification from office, or its tenure ? (Cons. Art. 6, sec. 3, 4, 5.)—See Barker vs. The People— (20 Johns. R. 459.)

It is further argued, that the constitution having authorised a disqualification from office or place, from suf-

frage and serving on juries, as the consequence of conviction of bribery, &c. or other *high crimes and misdemeanors*, it is therefore incompetent for the legislature to annex disqualification as a punishment to other cases and for other causes. This argument is founded upon the maxim of *expressio unius exclusio est alterius*. It may be conceded, that the enumeration of offences, on conviction for any one of which, power is given to the legislature to enact laws excluding the person convicted, from office, &c., is an implied negation of the right, to disqualify for any other cause of a kindred character. And the constitution having required the passage of laws, to render persons convicted of certain enumerated offences, or *other high crimes or misdemeanors*, incapable of holding office, &c. it may be well doubted, that but for the third section of the sixth article, whether the legislature could have incapacitated for *giving*, *accepting*, or *carrying a challenge to fight*, *&c.*, unless these had been first made *high crimes or misdemeanors*. So, in regard to the right of suffrage and serving on juries, it may be questioned whether the legislature may divest a citizen of these rights, for *offences* not embraced in the fifth section of the sixth article of the constitution; yet, in respect to serving on the juries, it has never been seriously doubted, within my knowledge, but the legislature may require the residence of a juror to be within the county, and also that he should be a freeholder or householder; for in making these requisitions it is not intended to punish crime, but merely to insure impartiality and discretion; and the constitution, in authorising disqualification as the consequence of crime, does

In the matter of J. L. Dorsey.

not impliedly inhibit these requisitions as essential to the competency of a juror.—(20 Johns. R. 461.)

But suppose my reasoning upon this point is false, yet the maxim by which the argument is attempted to be sustained, cannot be made to exert such potency as to forbid the legislature to enact laws denying privileges and franchises, subject to its own regulation, to those who have done acts subversive of the public peace, or calculated to lower the standard of public morals. *For such cases the constitution makes no provision, and consequently, they are left to the legislature, uncontrolled by any implied restraint.*

I am unaware of any acknowledged rule of construction which would authorise the conclusion that the convention, in prescribing an oath to be taken by "the members of the general assembly, and all officers, executive and judicial," with a view to secure their fidelity and patriotism in the public service, must have intended that the same oath should be taken by all persons on whom the legislature should confer a privilege or franchise; or that in providing a constitutional oath for officers, they inhibited the requirement of any other, of persons who might exercise a legislative franchise; except such as related particularly to the nature of the function, to be performed by them. With all deference to the opinions of those who think otherwise, such a conclusion, in my judgment, can only be attained by the assumption, that the privilege conferred upon an attorney, makes him *ipso facto*, a *governmental* officer, at least in respect to the matter of oaths; for such only as are charged with the interests of the public, are officers within the meaning of the constitution.

In the matter of J. L. Dorsey.

If it be conceded that an attorney is not a *public officer*, but insisted that he is *quasi* such, by a liberal construction of the constitution, and cannot therefore be required to take any other oath than that provided by it, unless it directly concern his professional duties;—I reply, that the argument still assumes too much. If he be *quasi* an officer, for the purposes of one provision of the constitution, where is the authority for divesting him of that character, when he is to be visited with another part of the same instrument? If he is to receive favors, shall he not also bear burthens? If he be an officer for the purposes of the first section of the sixth article of the constitution,—is he less so, when it is proposed to extend to him the third section of the same article? If so, where is the warrant for concluding that the constitution, in some of its *general provisions* in regard to *officers*, relates to attorneys, while from others it excludes them? Here are questions, which I confess my inability to answer. But all difficulties are at once removed, upon the hypothesis that the functions of an attorney, and the conditions on which they are to be exercised, are subject to legislative direction.

I desire not to be understood by any thing I may have said, as asserting that it is competent for the legislature to make the *giving, accepting, or carrying a challenge to fight*, &c., or other offence against the laws, *not really such, a high crime or misdemeanor*. And as the view which I take of the question before us, relieves me from considering whether it is competent for the legislature to require of officers such an oath as is provided by the act of eighteen hundred and twenty-six, or whether dis-

qualification should not be made dependent upon a legal conviction, I therefore leave these questions to be decided when they shall arise in judgment.

It is further argued, that the act of eighteen hundred and twenty-six, is against common right, and therefore void. A statute, it is true, cannot change the law of nature, for *jura naturæ sunt immutabilia*, and they are *leges legum*—Day vs Savage, (Hob. Rep. 87.) "The law of nature stands as an eternal rule to all men," says Locke, "legislators as well as others; and the rules that they make for other men's actions, must, as well as their own and other men's actions, be conformable to the will of God, of which that is a declaration." Lord Chief Justice Hobart was of opinion, that a law which makes a man a judge in his own case, is opposed to natural equity, and void. Lord Coke, (Bonham's case, 8 Rep. 116,) with the boldness which marked his public career, declared that the common law would control and adjudge void, an act of parliament against common right, or reason, or repugnant, or impossible to be performed. And Lord Holt, (City of London vs Wood, 12 Mod. R. 687,) influenced by the same high sense of justice,—with a mind relying upon its own vigor, and often setting at defiance the restraints of precedent, declared that the observation of Lord Coke was not extravagant, but was a very réasonable and true saying. But Lord Ellesmere, in his observations upon Coke's Reports, calls his opinion "a paradox, which derogateth much from the wisdom and power of Parliament, that where the three estates, King, Lords and Commons, have spent their labors in making a law, three judges on the bench shall destroy and frustrate

their pains, advancing the reason of a particular court above the judgment of all the realm." The same learned Lord recites, with approbation, the opinion of Chief Justice Herle, in the time of Edward the Third, when he said, "Some acts of Parliament are made against law and right; which they that made them perceiving, would not put them into execution; for it is *magis congruum*, that acts of Parliament should be corrected by the same pen that drew them, than be dashed to pieces by the opinion of a few judges." And Sir William Blackstone, distinguished for the extent and accuracy of his legal erudition, says, he knows of no power, within the ordinary forms of the British constitution, that is vested with authority to control an act of Parliament, upon the ground that its enactments are unreasonable. But if absurd consequences seem to grow out of a statute, the judges ought, in decency, to conclude that the consequence was not forseen by the legislature and only *quo ad hoc* to disregard it.—(1 Bla. Com. 91.) That the learned commentator lays down the rule correctly, I have no doubt. As qualified by him, it is sustained by the fitness of things. When carried thus far, it maintains a proper balance between the different departments of government, and thus, by acknowledging the just powers of all, inspires each with a proper respect for the other; and preserves that harmony so essential to internal quiet and public prosperity. It is the received opinion in England, at this day, that an act of Parliament, so plain and explicit in its terms, as not to allow an application of the rules of construction, cannot be disregarded or controlled, by any court of justice.

In the matter of J. L. Dorsey.

Mr. Justice Iredell, (whose great self-possession and accuracy of judgment, entitle his opinions to all respect,) in Calder and wife vs. Bull and wife, (3 Dal. R. 386,) after expressing the opinion, that a statute violative of constitutional provision is void, proceeds: "If, on the other hand, the Legislature of the Union, or the Legislature of any member of the Union, shall pass a law within the general scope of their constitutional power, the court cannot pronounce it to be void, merely because it is, in their judgment, contrary to the principles of natural justice. The ideas of natural justice are regulated by no fixed standard: the ablest and purest men have differed upon the subject; and all that the court could properly say, in such an event, would be, that the legislature (possessed of an equal right of opinion) had passed an act, which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice. There are, then, but two lights in which the subject can be viewed. 1. If the legislature pursue the authority delegated to them, their acts are valid. 2. If they transgress the boundaries of that authority, their acts are invalid. In the former case, they exercise the discretion vested in them by the people, to whom alone they are responsible for the faithful discharge of their trust: but in the latter case, they violate a fundamental law, which must be our guide, whenever we are called upon as judges to determine the validity of a legislative act." The learned judge places this question upon its true ground, and by his brief and common sense reasoning, excludes the opposite conclusion.

In this country, it cannot be endured, that the judges

7 P.                    53

should declare a statute void, because, in their opinions, it is incompatible with the abstract principles of civil liberty, unless it also opposes the constitution. There is no certain standard of reference by which these principles can be determined. They must depend upon the varying opinions of various minds, and it is nothing more than respectful to suppose, that the opinions of the law-givers upon a question of political expediency, are as apt to be correct as any other body. At any rate, the judicial, is not invested with power to supervise the legislative department: and it is well for the cause of freedom that it is not, or in coming time, we might witness the exercise of a judicial tyranny, more intolerant and intolerable than a legislature with unlimited powers. It is, then, my conclusion upon this subject, that to authorise the judiciary to declare an act of the legislature *void*, the act must appear to be *violative of the constitution, or of some one of its provisions.*

That the act of eighteen hundred and twenty-six is defensible upon principles of the purest morality and the soundest policy, I cannot doubt,—and that it is within the range of legislative competence, I am alike confident. If that confidence were faltering, it would be strengthened by the reflection, that the legislature which sat within three months after the adoption of the constitution, enacted a law in principle the same, and in terms, almost to the letter, similar to the act we are considering —(Toulmin's Dig. 264.) That in that legislature were many of those who had aided, in forming the constitution, and that both of these acts have been acquiesced in, from the periods of their enactment respectively, until this time.

In the matter of J. L. Dorsey.

I have considered the present question with the most anxious desire to attain a correct conclusion. While I feel a decent respect for the opinions of the legislature, and a just concern for its respectability, I am sure I shall never be so far influenced by these considerations, as to prevent me from scanning with fearlessness and impartiality, the extent of its powers. As a man, cherishing, I trust, an elevated patriotism, I could wish to see the different departments of government kept within their legitimate spheres of action,—as a magistrate, I could know no discretion, but to follow the line of duty.

I here close the view, which the arguments submitted to the court, required me to take of this interesting question, and I think it clear, both on principle and authority, that the terms on which attorneys shall be admitted, and the causes for which they shall be disbarred, are matters of legislative regulation : and consequently, that the act of eighteen hundred and twenty-six, to *suppress the evil practice of duelling*, so far as it relates to attorneys and counsellors, is not repugnant to the constitution.

It remains but to declare, that the application of Mr. Dorsey for admission to the bar of this court, should, in my opinion, be denied.

NOTE.—The Reporter deems it proper to remind the reader, that although he has been compelled to abridge the arguments of counsel, in the above case,—he has not interfered with the composition or style of those arguments, in any respect whatever. The condensation which has been adopted, has only extended to the omission of such paragraphs as were illustrative; and not absolutely essential to show the scope of the positions, relied on by the counsel.